CINCINNATI WOMEN'S SERVICES, INC., et al., Plaintiffs,

v.

Robert TAFT, et al., Defendants.

No. 1:98–CV–289.

United States District Court,
S.D. Ohio,
Western Division.

Sept. 8, 2005.

Alphonse Adam Gerhardstein, Jennifer Lynn Branch, Gerhardstein Branch & Laufman Co. LPA, Cincinnati, OH, David Alan Friedman, Fernandez Friedman Grossman Kohn & Son, Louisville, KY, for Plaintiffs.

Anne Berry Strait, Court of Claims Defense, Karl William Schedler, Assistant Attorney General, Court of Claims, Elizabeth Luper Schuster, Diane Richards Brey, Tracy Marie Greuel, Ohio Attorney General, Columbus, OH, James Warren Harper, A., Roger Edward Friedmann, Cincinnati, OH, for Defendants.

## FINDINGS OF FACT, CONCLUSIONS OF LAW, AND ORDER

BECKWITH, Chief Judge.

### I. Introduction and Procedural History

On January 14, 1998, the Ohio General Assembly passed H.B. 421. H.B. 421, if not enjoined by the Court, would make two substantive changes to the laws which regulate the provision of abortion services in Ohio.

First, H.B. 421 would require that a woman seeking an abortion obtain certain mandated informed consent information in a face-to-face meeting with a physician at least twenty-four hours prior to the performance of the procedure. Current law, at least as interpreted in an opinion of the Attorney General of Ohio, permits abortion providers to comply with the informed consent provision by giving the required information to the patient on a videotape or over the telephone.

Second, H.B. 421 would require that a minor seeking an abortion obtain the consent of at least one parent before the procedure can be performed, unless she can establish through a judicial bypass procedure that she is sufficiently mature to make this decision without her parents involvement or that an abortion would otherwise be in her best interests. H.B. 421 also eliminates a minor's ability to obtain a judicial bypass by establishing that she is a victim of a pattern of abuse by her parents or guardian. Additionally, H.B. 421 specifically withholds the juvenile courts' jurisdiction to rehear a petition for a judicial bypass regarding the same pregnancy. Under current law, a minor is only required to notify one of her parents before obtain-

ing an abortion and there are no specific limitations on the juvenile courts' jurisdiction to rehear a bypass petition.

The General Assembly intended H.B. 421 to go into effect on May 6, 1998. However, on April 17, 1998, Plaintiffs Cincinnati Women's Services, Inc. and Dr. Walter Bowers filed a pre-enforcement lawsuit against the Governor and Attorney General of Ohio, and the Hamilton County, Ohio Prosecuting Attorney to enjoin H.B. 421 pursuant to 42 U.S.C. § 1983.[1] The complaint alleges that the above-referenced provisions of H.B. 421 are facially unconstitutional pursuant to the United States Supreme Court's decision in *Planned Parenthood of Southeastern Pa. v. Casey*, 505 U.S. 833, 112 S.Ct. 2791, 120 L.Ed.2d 674 (1992), because each imposes an undue burden on a woman's right to obtain an abortion.

On April 28, 1998, the parties entered into an agreed order enjoining enforcement of H.B. 421 and maintaining the status quo under existing law pending the adoption by the Supreme Court of Ohio of rules implementing the judicial bypass procedures contained in the new bill. *See* Doc. No. 6. The parties then proceeded with some discovery, but the Supreme Court of Ohio did not issue amendments to its implementing rules until around October 2001. The parties completed discovery and the case came before the Court from February 14, 2005 to February 23, 2005 for a trial to the bench on Plaintiffs' motion for a preliminary and permanent injunction. The parties submitted proposed findings of fact and conclusions to the Court on May 25, 2005 and the Court heard the parties' closing arguments on June 17, 2005.

The matter is now ready for decision by the Court.

### B. The Law Applicable to Abortion Regulation

When a case is tried to the bench, the Federal Rules of Civil Procedure require the trial court to make and set forth the findings of fact and conclusions of law supporting its judgment. Fed.R.Civ.P. 52(a). It is the standard practice of this Court when complying with its obligations under Rule 52(a) to first render its findings of fact, then discuss the applicable law, and conclude by rendering its conclusions of law. This case, therefore, represents something of a departure from the norm in that here the Court begins by discussing the applicable law. But this is a case where an understanding of the applicable law, or at least an explanation of the Court's understanding of the applicable law, is necessary to inform the fact-finding process. As will be seen, much of Plaintiffs' evidence can be accepted at face value, as would be the case on summary judgment, without affecting the ultimate conclusions of law. In the end, the Court believes, Plaintiffs' evidence does not demonstrate that H.B. 421 imposes undue burdens on the abortion right even when viewed in a highly deferential manner. Consequently, it is important to first es-

---

1. Dr. Norman Matthews was originally a plaintiff but was replaced by Dr. Bowers. The original defendants in this case were Governor George Voinovich, Attorney General Betty Montgomery, and Prosecuting Attorney Joseph T. Deters. Because of the march of time and the fortunes of the electoral process, Governor Robert Taft has been substituted for Governor Voinovich and Attorney General Jim Petro has been substituted for Attorney General Montgomery. Interestingly, Mr. Deters has come full circle in this case. When Mr. Deters became the Treasurer of the State of Ohio, the new Hamilton County Prosecutor, Michael K. Allen, was substituted as a defendant for Mr. Deters. When Mr. Allen left office, Mr. Deters was re-elected the Hamilton County Prosecuting Attorney and found himself a party in this lawsuit again.

tablish what the law is in order to understand why the proofs do not demonstrate any constitutional violation.

The Court next observes that many, if not most, courts whose decisions are of recent vintage acknowledge at some point the deeply emotional and divisive nature of the abortion issue, sure in the knowledge that their decisions will rankle one side of the debate. *See, e.g., Stenberg v. Carhart*, 530 U.S. 914, 920, 120 S.Ct. 2597, 147 L.Ed.2d 743 (2000); *Casey*, 505 U.S. at 866–67, (112 S.Ct. at 2815); *Women's Med. Prof. Corp. v. Voinovich*, 130 F.3d 187, 211 (6th Cir.1997) (Boggs, J., dissenting); *Greenville Women's Clinic v. Bryant*, 222 F.3d 157, 175 (4th Cir.2000); *Karlin v. Foust*, 188 F.3d 446, 497 (7th Cir.1999) (Cudahy, J., concurring in part and dissenting in part). This Court, therefore, would be remiss in not likewise acknowledging the passions that surround the issue of abortion. Nevertheless, at this level in the judicial hierarchy, courts have very little opportunity to articulate new constitutional rights. Instead, district judges follow precedent established by the Courts of Appeals and the United States Supreme Court. Although now and again a trial court will face an issue of first impression, for the most part district judges are charged with applying the standards enunciated by the higher courts to the facts in the cases before them. This is not an easy task in abortion cases, however, because upon study it becomes evident that it is difficult or impossible to apply predictably the legal standards that do exist.

■ Where abortion is concerned, and more particularly where a state's ability to regulate abortion is concerned, for district judges there are three principles which are certain: 1) before the fetus is viable, a woman has the right to terminate her pregnancy; 2) the state has an interest in the fetus pre-viability and may design and pass laws to further that interest which do not impose an undue burden on a woman's right to terminate her pregnancy; and 3) post-viability, the state may go so far as to proscribe abortion except where necessary to preserve the life or health of the mother. *Stenberg v. Carhart*, 530 U.S. 914, 921, 120 S.Ct. 2597, 147 L.Ed.2d 743 (2000). The tension between the first two principles is obvious and the problem is ascertaining whether the regulation or restriction enacted by the state is an undue burden. *See Taft*, 353 F.3d at 449 ("[W]e cannot ignore the difficulty of legislating against a backdrop of constitutional standards that invite state regulation on one hand while barring it with the other.").

Unfortunately, the definition of "undue burden" is not clear. The Supreme Court instructs that a restriction is an undue burden if "it has the purpose or effect of placing a substantial obstacle in the path of a woman seeking an abortion of a nonviable fetus." *Casey*, 505 U.S. at 877, 112 S.Ct. 2791. The Court did not further elaborate on the meaning of "substantial obstacle" although later in the opinion it indicated that a regulation would be a substantial obstacle if it burdens a "large fraction" of the women to whom the regulation is relevant. *Id.* at 2830. The Court did not further indicate what number constitutes a "large fraction." In *Stenberg*, the Court purported to apply the *Casey* standard to a statute which criminalized partial-birth abortion, *see Stenberg*, 530 U.S. at 921, 120 S.Ct. 2597, but the statute, as interpreted by the Court, swept into its net the most common method of performing second trimester previability abortions. *Id.* at 945–46, 120 S.Ct. 2597. Because the statute banned the most common method of second trimester abortions, it did not take any significant analysis by the Court to conclude that the statute imposed an undue burden.

Our own Court of Appeals has not fared any better in outlining the contours of an undue burden although it has stated that a post-viability regulation "which threatens the life or health of even a few pregnant women should be deemed unconstitutional." *Women's Medical Prof. Corp. v. Voinovich,* 130 F.3d 187, 196 (6th Cir.1997). This case, however, does not involve a post-viability regulation on abortion. Moreover, in actually applying the undue burden standard in the pre-viability context, the *Voinovich* Court faced the same issue as the *Stenberg* Court. The ban on partial birth abortion included the most common method of performing second trimester abortions and, therefore, "would clearly have the effect of placing a substantial obstacle in the path of a woman seeking a pre-viability abortion." *Id.* at 201. Again, no detailed analysis was required. In *Memphis Planned Parenthood v. Sundquist,* 175 F.3d 456 (6th Cir.1999), the Court upheld Tennessee's parental consent statute primarily by comparing and contrasting the statutes at issue in other cases, and employing its own logical assessment of the likely effect of the statute, rather than engaging in any straightforward application of the undue burden standard. *See id.* at 460–66. The Court in *Women's Medical Prof. Corp. v. Taft,* 353 F.3d 436 (6th Cir.2003), discussed *Casey* but the issue presented was whether the maternal health exception to Ohio's ban on partial birth abortion was constitutional under *Stenberg. See id.* at 438–39.

The "large fraction" standard enunciated in *Casey* by nature invites the courts and the parties to engage in a number-crunching exercise to assess the impact of an abortion regulation. The parties have tried to do so here. Nevertheless, stating that a "large fraction" constitutes a substantial obstacle is not the same thing as defining a "large fraction." Because the Supreme Court instructs that the constitutional analysis should focus on only those women for whom the restriction is actually relevant, *Casey,* 112 S.Ct. at 2829, the argument devolves to which group of women is properly considered the numerator and which group of women is properly considered the denominator. Even if a court properly identifies the numerator and denominator, it still must decide whether the resulting fraction is "large." Again, the *Casey* Court provides no real guidance.[2] This Court's research has not developed any decisions in which the courts which have successfully applied, or have even attempted to apply, the large fraction test.

■ Finally, the problems outlined above are exacerbated in the context of a pre-enforcement facial challenge by the lack of any data on the actual impact of the regulation. At best then, in a facial challenge the evidence on the effect of a statute regulating abortion can only be informed speculation. *Newman,* 305 F.3d at 687. However, because the Plaintiffs bear the burden of proof, the Court agrees with the Seventh Circuit that it is appropriate to resolve doubts about the likely impact of a regulation on abortion in favor of the state. *Id.*

■ During closing arguments, counsel for Plaintiffs argued that Plaintiffs need not produce precise numbers on the impact of H.B. 421 and that it was sufficient for Plaintiffs to prevail if they dem-

---

2. *See A Woman's Choice–East Side Women's Clinic v. Newman,* 305 F.3d 684, 699 (7th Cir.2002) (Coffey, J., concurring) ("The *Casey* plurality did not explain, and thus we refuse to peer into the dark abyss of speculation in an attempt to determine at precisely what point a fractional part of a group becomes an impermissibly 'large fraction' and a statute becomes unduly burdensome.").

onstrated that the act adversely affects a predictable, recurring, and identifiable group of women. This argument suffers from two flaws, however. First, this argument finds no support in any case law addressing abortion regulations and, indeed, Plaintiffs have not cited any such authority in their post-trial brief. Second, at bottom, this argument is nothing more than a contention H.B. 421 is unconstitutional because we know that some women will be unable to make two trips to the clinic in order to comply with the in-person informed consent requirement or that some minor women will be absolutely barred from obtaining an abortion because they cannot file a second bypass petition. The Sixth Circuit, however, has rejected the idea that this kind of evidence is sufficient for a plaintiff to prevail on a facial challenge:

> [A]ny procedure will, in conjunction with some conceivable set of circumstances, prevent some minor from effectively pursuing a judicial bypass. Our responsibility is to determine which procedures are so onerous as to be "undue," and the fact that some minors will be practically precluded by a procedure in conjunction with circumstance from pursuing a judicial bypass does not mean that the procedure is unconstitutional.

*Sundquist,* 175 F.3d at 463 n. 3 (emphasis in original). Therefore, despite the fact that this is a facial challenge to an abortion regulation, a plaintiff challenging such a regulation still needs to adduce evidence with some indicia of reliability, beyond the known certainty that a category of women will be affected or foreclosed by the regulation, before the court can say that the regulation is unconstitutional. Perhaps the Seventh Circuit explicated the undue burden standard most cogently when it said, "It is clear from *Casey's* application of the undue burden standard ... that to constitute an undue burden, a challenged

regulation must have a strong likelihood of *preventing* women from obtaining abortions rather than making abortions more difficult to obtain." *Karlin,* 188 F.3d at 482 (emphasis in original).

All of the preceding is but a long way of saying that in this Court's opinion, and as both Chief Justice Rehnquist and Justice Scalia predicted, the *Casey* undue burden standard is unworkable in practice in all but the most obvious cases, such as *Stenberg. See Casey,* 112 S.Ct. at 2866 (Rehnquist, C.J., dissenting) ("[The undue burden standard] will not, we believe, result in the sort of 'simple limitation,' easily applied, which the joint opinion anticipates.... In sum, it is a standard not built to last."); *id.* at 2877 (Scalia, J., dissenting) ("[T]he [undue burden] standard is inherently manipulable and will prove hopelessly unworkable in practice."). Thus, it is perhaps not too surprising to find dissenting opinions which assert that the majority manipulated the record and/or the *Casey* standard to suit its own policy preferences on abortion. *See, e.g., Newman,* 305 F.3d at 717 (Wood, J., dissenting)("I believe that the majority has seriously mis-applied the *Casey* test. It has substituted its own factual assumptions for evidence that is in the record; it has failed to focus on the women for whom that statute will create problems; and it seems to think that the *Casey* Court was not serious when it emphasized the lack of evidence in the record before it, by implying that the result in *Casey* dictates the result here."); *Planned Parenthood of Rocky Mountains Serv. Corp. v. Owens,* 287 F.3d 910, 932 (10th Cir.2002) ("In my opinion, the Court is much too eager to apply its view of Colorado state statutory interpretation to strike on its face, not a single prohibitory statute like that at issue in *Stenberg,* but a multi-section act directly approved by the voters of Colorado.");

*Bryant,* 222 F.3d at 207 (Hamilton, J., dissenting) ("When considering the majority's analysis based on its chosen and carefully selected facts, ignoring the findings of fact by the district court, it can only be concluded that the majority's opinion is based on its view of the law as it would like to see it and, perhaps more significantly, on not what the current law would dictate, but only what the majority prophecies the law will be if and when this case reaches the Supreme Court."); *Sundquist,* 175 F.3d at 468 (Keith, J., dissenting) ("The majority's outcome-driven decision today ignores the standard of review we are bound to employ in adjudicating such an appeal; perverts the law; and does violence to the constitutional rights and liberties guaranteed to every female in this country."); *Planned Parenthood of Wis. v. Doyle,* 162 F.3d 463, 476 (7th Cir.1998) (Manion, J., dissenting)("This court sidesteps the undue burden test and instead concludes that Wisconsin has no legitimate interest in enacting the partial birth abortion ban.").

At this point, it is evident that *Casey* produces decisions that seem to be based more on intuition than application of a discernible legal standard. The need for more clarity is acute because, as Judge Boggs and others have noted, legislatures will continue to legislate in this area, prochoice advocates will continue to challenge such legislation, and the federal courts will continue to be caught in the middle. *See Voinovich,* 130 F.3d at 211–19 (Boggs, J., dissenting)(comparing abortion legislation to the parable of Charlie Brown, Lucy, and the football); *Owens,* 287 F.3d at 931 ("[S]tate lawmakers continue to test the limits of *Roe* and courts continue to police those limits with no foreseeable end to the struggle."). The Court notes that the Supreme Court recently granted *certiorari* in *Ayotte v. Planned Parenthood of Northern New England,* — U.S. ——, 125 S.Ct.

2294, 161 L.Ed.2d 1088 (2005), in which one of the questions presented is whether "in a facial challenge to a statute regulating abortion ... the undue burden standard cited in *Planned Parenthood of Southeastern Pa. v. Casey,* 505 U.S. 833, 876–77, 112 S.Ct. 2791, 120 L.Ed.2d 674 (1992) and *Stenberg v. Carhart,* 530 U.S. 914, 921, 120 S.Ct. 2597, 147 L.Ed.2d 743 (2000) applie[s] rather than the 'no set of circumstances' standard set forth in *United States v. Salerno,* 481 U.S. 739, 107 S.Ct. 2095, 95 L.Ed.2d 697 (1987)?" *See* Petitioner's Petition for *Certiorari,* available at 2005 WL 474024 (Feb. 22, 2005). A decision that *Salerno* applies to facial challenges to abortion regulations obviates all of the concerns and problems discussed above because it is likely, as the evidence showed in this case, that abortion regulations will not pose an undue burden in the vast, vast majority of individual cases. Of course a decision that *Salerno* is the proper standard could have the unintended effect of transforming the federal courts into a forum for adjudicating seriatim a series of as-applied constitutional challenges to abortion regulations. Clearly, there are no easy answers in this area of the law. At a minimum, however, the Court hopes that the *Ayotte* Court will take the opportunity to clarify the *Casey* undue burden standard.

■ The Court began this section by stating that it would attempt to explain its understanding of the law concerning abortion, and though bright lines appear to have been established, in the end a predictable means of determining when the legislature has crossed the line does not appear to exist. It is, however, safe and fair to say that whatever an undue burden is, a plaintiff cannot, except where it is obvious that the statute will result in widespread foreclosure, demonstrate an undue burden by relying on informed speculation

on the likely impact of an abortion regulation. In this case, as the Court explains below, Plaintiffs' evidence fails to establish that H.B. 421 unduly burdens the right to abortion because it is either speculative, or even where accepted as true, fails to establish an undue burden as a matter of law.[3]

## II. Findings of Fact

### A. The Parties

1. The Plaintiffs in this case are Cincinnati Women's Services, Inc. ("CWS") and Walter T. Bowers, II, M.D. Complaint ¶¶ 8–9; see also supra at 2 n. 1. CWS is an Ohio corporation and ambulatory surgical facility which provides reproductive health services, including pregnancy testing, contraceptive services and education, and abortions. Id. ¶ 8. Dr. Bowers is the medical director of CWS and provides medical services, including abortions, through CWS. Id. ¶ 9.

2. The Defendants in this case are Robert Taft, Governor of the State of Ohio, Jim Petro, Attorney General of the State of Ohio, and Joseph Deters, Prosecutor of Hamilton County. Complaint ¶¶ 13–15, see footnote 1. Plaintiffs sue Defendants Taft, Petro, and Deters in their official capacities only.

### B. Informed Consent

3. Implementation of H.B. 421 would require patients to come to the clinic in person for an informed consent meeting with the physician at least twenty-four hours before an abortion. See H.B. 421 (available 1998 OHIO LAWS FILE 122) (to be codified at Ohio Rev.Code § 2317.56(B)(1)).

4. Current law, as interpreted in an attorney general opinion, permits CWS to use a different informed consent procedure than that which H.B. 421 would require. When a woman approaches CWS seeking an abortion, her first contact is usually over the phone. Jackson Trial Trans. at 1–145. She is given a brief overview of the process and then she is able to schedule two appointments. Id. at 1–146–149. The first appointment is for an informed consent visit and the second appointment is for the actual procedure. Id. at 1–145 and 1–150. In accordance with existing law, the informed consent procedure must occur at least twenty-four hours before the procedure. Id. at 1–150–151.

5. When the patient comes to the clinic for the first visit, she watches an informed consent video in a private setting. The video features Dr. Bowers explaining how to determine the gestational age of the fetus, the nature and risks of the particular abortion procedure that will be used, and the medical risks of carrying the pregnancy to term. Jackson Trial Trans. at 1–151. This information is not individualized to the woman's particular medical history or conditions. Bowers Trial Trans. at 4–41.

6. CWS has different informed consent videos for first and second trimester abortions. After viewing the video, the patient meets with a patient advocate, who further explains the procedure and answers any questions. The patient is given the opportunity to speak with the physician by phone thereafter. Jackson Trial Trans. at 1–151.

7. CWS then provides the patient with a state-mandated fetal development booklet

---

3. As will be explained further, two examples of Plaintiffs' case failing as a matter of law based on their evidence are their contentions that the in-person consent requirement will unduly increase the cost of abortions and result in undue delays in procedures being performed. An area where Plaintiffs' evidence is speculative is the impact of the unavailability of a second judicial bypass for minors.

and services directory as required under existing law. Jackson Trial Trans. at 1–154–155.

8. Dr. Bowers testified that providing the informed consent information by a video insures that each patient receives the same information about the procedure. Bowers Trial Trans. at 4–10. Dr. Bowers believes that the manner in which CWS provides informed consent is consistent with the medical standard of care for informed consent. *Id.* In addition, Dr. Paula Hillard agreed that the information on CWS's videotape is accurate and that this informed consent process meets the medical standard of care. Hillard Trial Trans. at 1–137 and 1–58.

9. However, Dr. T. Murphy Goodwin testified that in his opinion, the manner in which CWS conducts informed consent is not a sufficient or acceptable medical standard of care. Goodwin Trial Trans. at 5–35. Dr. Goodwin stated that the videotape that CWS uses on the visit is an important adjunct, but that it should be supplemented by individualized attention available from speaking with a doctor. *Id.* Additionally, Dr. Elizabeth Shadigian testified that she believed H.B. 421 comported with and was similar to the medical standards of care common in the field of obstetrics and gynecology. Shadigian Trial Trans. at 6–14–15.

10. Plaintiffs contend that H.B. 421 will cause a delay in abortion services. Debi Jackson, president and executive director of CWS, testified that the difficulty in hiring additional doctors to administer informed consent would mean that currently employed physicians would ultimately have to perform the informed consent. .Jackson Trial Trans. at 2–15–18. With a limited number of doctors having to divide their time between performing informed consent and abortion services, a woman's ability to receive an abortion would be delayed.

Jackson Trial Trans. at 2–22. Under H.B. 421, Debi Jackson testified that she would expect delays of one to two weeks in receiving abortions. *Id.*

11. H.B. 421 does not require that the in-person informed consent occur at the facility where the abortion is to be performed. In addition, the physician involved in the meeting need not be affiliated with the facility or with the physician who is scheduled to perform the abortion. Jackson Trial Trans. at 2–15–16. However, Debi Jackson testified that CWS's malpractice carrier would not accept the idea that their patients were receiving informed consent from physicians unaffiliated with CWS. *Id.* at 2–16.

12. Debi Jackson estimated that H.B. 421 would cause a $100 increase in the cost of an abortion. Jackson Trial Trans. at 2–22. Depending on the patient's last menstrual period, a $100 increase would represent anywhere from a 7.50% to 16% increase over CWS's usual and customary fee, a 10% to 21% increase over CWS's discounted fee, and an 11% to 25% increase over the Medicaid discount fee. Joint Ex. XXXVI.

13. Debi Jackson testified that currently at CWS, approximately 5–10% of the patients are excused from coming to the clinic for the informed consent visit. Some women are excused from coming because of the distance of their residences from the clinic, their lack of resources, or because of interference from an abusive partner. Jackson Trial Trans. at 1–172.

14. Debi Jackson also testified that approximately 7–18% of the patients excused from attending the informed consent visit in person are excused because of partner abuse. Jackson Trial Trans. at 1–176–177.

15. Those patients excused from the in-person informed consent meeting receive all the information about the procedure via

mail and are given the opportunity to listen to an audio version of Dr. Bower's video over the phone, as well as speak with CWS patient advocates. Jackson Trial Trans. at 1–173–174.

16. Witnesses from two other abortion clinics in Ohio also testified in this case. The patient advocates from both *Capital Care* clinic in Columbus and *Center for Choice* clinic in Toledo testified that they believe their respective clinics records indicate that they excuse approximately 5–10% of the patients from the in-person meeting requirement. Jackson Trial Trans. at 1–172; Earley Trial Trans. at 2–158–159; Ludlow Trial Trans. at 3–94.

17. These witnesses also testified regarding the percentage of abused women that are excused from the in person informed consent visit. *Capital Care* estimates that of the approximately 6% of patients who are excused, about 20–25% of that group are abused women. Earley Trial Trans at 2–158–159, 2–169–170. Similarly, *Center for Choice* testified that of the approximately 6% of patients who are excused, about 25% of that group are abused women. Ludlow Trial Trans at 3–94, 3–116–117.

18. CWS has been the target of violence in the past. However, Debi Jackson testified that the last significant incident of violence was in 2000 when she received, but did not open an antipersonnel bomb. Debi Jackson Trial Trans. at 2–9.

### C. *Judicial Bypass for Minors*

19. H.B. 421 would also change the judicial bypass process for minors. Under existing law, pursuant to Ohio Revised Code § 2151.85, minors can seek a bypass hearing to override the parental notice requirement before they receive an abortion if they meet certain criteria. Ohio Rev.Code § 2919.12(B). Under H.B. 421, the parental requirement would change from notice to consent and minors could seek a judicial bypass hearing to avoid the need for parental consent to obtain an abortion. Rauh Trial Trans. at 3–20.

20. Currently, those minors who fear physical or emotional abuse if notice of their abortion is given to their parent or guardian and that fear is based on a pattern of prior physical, sexual or severe emotional abuse can request a bypass hearing. Ohio Rev.Code § 2919.12(B). If the juvenile court finds that one or both parents have engaged in such abuse and that the minor is sufficiently informed about the abortion procedure, then the court is required to authorize the minor to consent to her own abortion without notice to her guardian. Ohio Rev.Code § 2151.85(C)(2).

21. Under H.B. 421, however, the Act establishes a new juvenile court bypass procedure. H.B. 421 no longer requires the court to grant a bypass on the basis of physical, sexual or severe emotional abuse of the minor. H.B. 421 prohibits a rehearing or second presentation of a request for a bypass based on the same pregnancy. Ohio Rev.Code § 2919.121(C). The juvenile court must hear the case within five days of the minor filing the petition and if the court finds that the minor is "sufficiently mature and well enough informed to decide intelligently whether to have an abortion," the court shall grant the petition. The Act continues to require that the juvenile courts act in the best interest of the minor. *Id.*

22. Most judicial bypasses occur in the first trimester of a minor's pregnancy. Rauh Trial Trans. at 3–22; Goodwin Trial Trans. at 5–96–97. Under H.B. 421, a minor who is denied a bypass would be unable to file for another bypass if circumstances change in her pregnancy. Ohio Rev.Code § 2919.121(C).

23. As a part-time magistrate with the Cuyahoga County Juvenile Court in Cleveland, Richard Graham testified regarding the implementation of H.B. 421. Graham Trial Trans. at 2–110. Magistrate Graham testified that currently at the hearing a judge determines whether a minor is mature and well-informed. *Id.* at 2–120. He indicated that there have been times when it was apparent that a bypass was denied because the minor failed by oversight to adequately discuss facts that the minor knew or could easily learn. In those instances, Magistrate Graham stated that he would advise the minor's attorney to file another bypass petition during the same pregnancy based on changed circumstances once the minor received additional education and counseling. *Id.* at 2–122–123. However, under the current law, Magistrate Graham was unable to cite to any examples of minors who had been denied bypass petitions and who subsequently re-petitioned due to changed circumstances. *Id.* at 2–138.

24. Fetal anomalies occur in approximately 3% of pregnancies whether the woman is a minor or an adult. Hillard Trial Trans. at 1–78; Goodwin Trial Trans. at 5–70.

25. Doctors Hillard, Bowers and Goodwin all testified that doctors are unable to diagnose fetal anomalies until the second trimester. Hillard Trial Trans. at 1–75; Bowers Trial Trans. at 4–11–12; Goodwin Trial Trans. at 5–94. The majority of fetal anomalies are not detected in the first trimester. Testing for chromosomal anomalies that might include sampling amniotic fluid is not typically done until week 14 or 16, which is the second trimester. In addition, fetal developmental anomalies are not usually visible on ultrasound until the second trimester. Hillard Trial Trans. at 1–49–50.

## III. *Conclusions of Law*

To the extent that the following findings of fact should more properly be considered conclusions of law, and vice versa, they are hereby adopted as such.

### A. *The In–Person Informed Consent Requirement*

■ H.B. 421's requirement that women seeking an abortion meet in-person with a physician for an informed consent meeting at least twenty-four hours prior to the performance of the procedure does not create a substantial obstacle for women seeking abortions. The Court will first address and dispose of the less meritorious arguments concerning the alleged unconstitutionality of this requirement.

■ The Supreme Court, of course, has already determined that the state may mandate that licensed physicians, instead of other trained medical personnel, perform the informed consent function and that such a requirement does not impose an undue burden on women seeking an abortion. *Casey,* 505 U.S. at 884, 112 S.Ct. 2791; *Mazurek v. Armstrong,* 520 U.S. 968, 974–75, 117 S.Ct. 1865, 138 L.Ed.2d 162 (1997). Therefore, the State of Ohio may mandate that a licensed physician perform the informed consent function without violating the constitution.

■ According to Plaintiffs, the delays and scheduling problems which would be created by the informed consent provisions of H.B. 421 could postpone the performance of an abortion by up to two weeks. *See* Finding of Fact 10, *supra,* at 18. A delay of up to two weeks, however, does not impose an undue burden on women seeking abortions. As Defendants point out, the Supreme Court in *Casey* found that the 24 hour informed consent provision at issue there did not impose a substantial obstacle or create a real health risk, *Casey,* 505 U.S. at 886, 112 S.Ct.

2791, even though the district court found that the law would delay abortions for the majority of women in the state of Pennsylvania from anywhere from 48 hours to two weeks. *See Planned Parenthood of Southeastern Pa. v. Casey,* 744 F.Supp. 1323, 1351 (E.D.Pa.1990). Therefore, the Court concludes that even if H.B. 421 causes abortion procedures to be delayed for two weeks, it does not impose an undue burden on women seeking abortions.[4]

■ Plaintiffs' next complaint about H.B. 421 is the increase in the cost of a procedure it would impose. As indicated, Plaintiffs estimate that H.B. 421 would increase the cost of an abortion by about $100, which would at the maximum represent a 25% increase over the current cost of the procedure. Finding of Fact 12, *supra,* at 19. Nevertheless, a 25% increase in cost does not impose an undue burden on women seeking abortions. In *Casey,* the Court stated that a regulation that has an incidental effect of making an abortion more expensive is not unconstitutional. *See Casey,* 505 U.S. at 874, 112 S.Ct. 2791. In the Court's opinion, causing a $100 or 25% increase in the cost of an abortion does not impose an undue obstacle as a matter of law. For instance, in *Greenville Women's Clinic v. Bryant,* 222

F.3d 157 (4th Cir.2000), the Court held that a regulation which raised the cost of an abortion by $75.00 did not impose an undue burden. *Id.* at 170. Similarly, in *Planned Parenthood, Sioux Falls Clinic v. Miller,* 860 F.Supp. 1409 (D.S.D.1994), the Court held that a $60 dollar increase did not impose an undue burden. *Id.* at 1420. In a dissenting opinion which presaged her opinion in *Casey,* in *City of Akron v. Akron Center for Reproductive Health, Inc.,* 462 U.S. 416, 103 S.Ct. 2481, 76 L.Ed.2d 687 (1983), Justice O'Connor wrote that a regulation which doubled the cost of an abortion would not be unduly burdensome. *See id.* at 466 (O'Connor, J., dissenting).[5] The Court, therefore, finds that by increasing the estimated cost of an abortion by $100, or about 25%, H.B. 421 does not create an undue burden on the right to obtain an abortion.

In their brief, Plaintiffs argue that the study done by Dr. Ted Joyce on the impact on abortion of Mississippi's two visit law shows that H.B. 421 will create an undue burden. As Defendants point out, however, a number of courts have concluded that this study has flaws which render it of little evidentiary value. Of primary significance, however, is that the study does not

---

4. In *Ohio v. Akron Center for Reproductive Health,* 497 U.S. 502, 110 S.Ct. 2972, 111 L.Ed.2d 405 (1990), the Supreme Court cautioned against deciding a facial challenge to a statute based on the worst-case scenario. *See id.* at 514, 110 S.Ct. 2972. In that case, the Court held that it was "plainly insufficient" to hold the judicial bypass statute at issue facially unconstitutional because under the worst case a procedure could be delayed by twenty-two days. *Id.* Here, Plaintiffs' estimate of a two week delay seems to be an informed guess and, therefore, falls in the realm of a worst-case scenario. The Court notes, however, that *Akron* was pre-*Casey* and decided under "the no set of circumstances test" instead of the undue burden test. Therefore, *Akron* does not control the issue here under

Sixth Circuit precedent. *Voinovich,* 130 F.3d at 196.

5. The majority in *Akron* found that the increase in cost created "a significant obstacle in the path of women seeking an abortion," and, therefore, the regulation was unconstitutional. *City of Akron,* 462 U.S. at 434–35, 103 S.Ct. 2481. In *Casey,* however, the plurality adopted Justice O'Connor's "unduly burdensome" standard from her dissent in *City of Akron,* as well as her opinions in other cases, in fashioning the undue burden standard courts now apply. *See Casey,* 505 U.S. at 874, 112 S.Ct. 2791. Given that *Casey* overruled *Akron,* Justice O'Connor's dissent seems to be at least persuasive authority regarding the constitutional impact of a cost increase.

adequately account for the fact that abortions may have declined in Mississippi because the state was successful in its efforts in persuading women not to have abortions. *Newman*, 305 F.3d at 688–89; *Karlin*, 188 F.3d at 487; *Eubanks v. Schmidt*, 126 F.Supp.2d 451, 456–57 (W.D.Ky.2000).[6] That goal is completely compatible with *Casey*. *See Casey*, 505 U.S. at 878, 112 S.Ct. 2791. Defendants' expert, Dr. Uhlenberg, observes that both in Mississippi and the United States abortion rates had been increasing from 1986 to 1990, but began been trending downwardly since 1992. Def. Ex. K–2, Uhlenberg Dec. ¶ 7c. Therefore, it is possible that the decrease in abortions in Mississippi observed by Dr. Joyce was simply part of a national trend not related to Mississippi's waiting period.

The Court additionally notes, as do Defendants, that there are significant differences between Ohio and Mississippi which make extrapolating Mississippi's experience to Ohio a tenuous proposition. The main differences are that Ohio's population is mostly in urban areas, whereas Mississippi has primarily a rural population, and that Ohio has significantly more abortion clinics than Mississippi. Def. Ex. L, Uhlenberg Dec. ¶ A2b (indicating that 80% of Ohio's population lives in metropolitan areas whereas only 34% of Mississippi's population lives in metropolitan areas); Def. Ex. o, Wei Dec. ¶ 7 (indicating that only 5% of the counties in Mississippi have abortion providers); *id.* ¶ 16 (indicating that Ohio has at least sixteen abortion providers). Overall, a two trip requirement will impose less of a burden on a population centered in urban areas, where

the clinics are located, than in a rural area, where they are not.

The Court, therefore, agrees with those courts that have rejected Dr. Joyce's study as being unreliable.

The record does not reflect that protestors and violence aimed at clinics imposes an undue burden on women seeking abortions. The argument is that women will be inhibited from seeking abortions because H.B. 421 will require patients to go to the clinic twice and thus be exposed to protestors twice. In *Casey*, however, the Court specifically rejected the argument that this evidence demonstrates an undue burden. *See Casey*, 505 U.S. at 885–86, 112 S.Ct. 2791. Even if *Casey's* conclusion was based only on the record before it, and *Casey* does not establish the principle as a matter of law, Plaintiffs' evidence in this case falls short of demonstrating that H.B. 421 creates an undue burden because of abortion protestors. While it does not downplay the significance of prior episodes of violence, the Court is obligated to note that the last serious incident of violence directed at CWS occurred in 2000. *See* Finding of Fact 19, *supra*, at 7.[7] Thus, violence or the threat of violence does not currently create any obstacle. The highly-publicized cases involving abortion protestors Clayton Waagner and Eric Rudolph, to which Plaintiffs refer in their brief, if anything illustrate that law enforcement has been effective in dealing with perpetrators of violence against abortion providers. Although each of the clinics that provided testimony in this case has regular protestors, for the most part they are few

---

6. Dr. Joyce does try to avoid this shortcoming by noting that clinics reported that very few women changed their minds about getting an abortion. Nevertheless, as Dr. Wei points out in his declaration, absent from Dr. Joyce's study are any statements directly from the women themselves as to why they chose to

obtain their abortions out of state. Def. Ex. O, Wei Dec. ¶ 7.

7. Capital Care Women's Center had an anthrax threat in October of 2001. Stelzer Trial Trans., at 3–77, 3–78.

in number and have not been shown to create any significant reluctance in their patients.[8] In fact, it appears that the protestors conduct themselves in a generally peaceful manner. *See* Jackson Trial Trans., at 2–5, 2–6 (indicating that protestors approach cars and pedestrians to "talk to them and hand them literature."). Additionally, CWS has off-street parking, which also limits its patients' exposure to protestors. *See id.* at 2–102, 2–103. In summary, the Court concludes that H.B. 421 does not significantly increase the patients' exposure to abortion protestors.

The most difficult question to answer is the degree to which H.B. 421 will expose women in abusive relationships to further abuse because a two trip requirement makes it more likely that the abuser will discover the attempt to obtain an abortion. The companion question is ascertaining or attempting to ascertain how many women will forego obtaining an abortion rather than risk two trips to the clinic to comply with H.B. 421. The Court first notes, however, that H.B. 421 does not require the informed consent be performed by the same physician who will be performing the abortion. Although CWS claims that its insurance carrier would not allow a non-affiliated physician to perform the informed consent procedure, it did not produce any policy or statement from the insurance company to that effect. Furthermore, any such restriction imposed by

an insurance company cannot fairly be attributed to the statute.

Each of the clinics reported that it currently excuses about 5–10% of its patients from the in-person informed consent meeting, and they further estimate that of the women they excuse, about 25% are abused women. *See* Findings of Fact 14–19, *supra*, at 5–7. In raw numbers, this evidence indicates that about 2.5% of all women who seek abortions at these clinics received waivers of the in-person meeting requirement. That mathematical exercise, however, does not advance resolution of the problem very far, because according to *Casey* the trial court is limited to assessing the impact to the population to whom the regulation is relevant rather than the population of women as a whole. On the other hand, it is not fair to assume that the. in-person meeting requirement would be an obstacle to all 2.5% of the abused women who seek abortions because no matter how insistent the clinic is about the need for informed consent to be given in person, under the current state of law, the clinic is always free to waive the requirement. The clinics, not without some justification, are most likely prone to erring on the side of granting a waiver than withholding it. What is not known, however, and what is Plaintiffs' burden to establish with some degree of reliability, is the number of women who would forego an abortion upon being informed that the two visit

---

8. *See* Jackson Trial Trans., at 2–99, 2–100 (indicating that CWS typically has one to five protestors who do not obstruct ingress and egress to the clinic); (Ludlow Trial Trans), at 3–112 (indicating that Center for Choice in Toledo has anywhere from three to fifteen protestors); *id.* at 3–94 ("For the most part our protestors are fairly benign[.]"). Capital Care Women's Center averages more protestors, between twenty-five and fifty, but they come only on Saturdays. Stelzer Trial Trans., at 3–62; Earley Trial Trans., at 2–186. Although Saturday is the clinic's busiest day, it

also performs procedures on Wednesday and Thursday when there are no protestors. Stelzer Trial Trans., at 3–70. Capital Care's protestor's are more confrontational, however. *See id.* at 3–63, 3–64, 3–65. Most of the protestors congregate in the front of the clinic, whereas about half of the patients use the rear entrance. *Id.* at 3–74. It further appears that Capital Care uses only the rear door on Saturdays, *id.* at 3–75, which would significantly reduce its patients' exposure to the protestors.

requirement is mandated by state law and cannot be waived. Undoubtedly some women will choose not to have an abortion and some women will more likely than not decide to comply with the statute. Any conclusion beyond this is only speculation, but just supposing that some women will be practically precluded from obtaining an abortion does not render H.B. 421 unconstitutional. *See Sundquist,* 175 F.3d at 463 n. 3. In the end, based on this record, the Court cannot conclude that the in-person informed consent requirement of H.B. 421 creates a substantial obstacle for abused women.

In closing this section of its opinion, the Court observes that the question for it to decide is not whether CWS's method of performing informed consent is good enough or whether H.B. 421 is too inflexible or whether the health benefits to be reaped from it are outweighed by increased risks to abused women. These are policy issues. H.B. 421 may in fact represent bad policy, but this Court does not sit to remedy unwise policies, only unconstitutional ones. *See Day–Brite Lighting, Inc. v. Missouri,* 342 U.S. 421, 423, 72 S.Ct. 405, 96 L.Ed. 469 (1952) ("Our recent decisions make plain that we do not sit as a super-legislature to weigh the wisdom of legislation nor to decide whether the policy which it expresses offends the public welfare."). With regard to the former question, however, the Court notes that there was a difference in opinion between the experts whether CWS's informed consent procedure is consistent with the medical standard of care, *see* Findings of Fact 8–9, *supra,* at 3–4, and no one seems to dispute that, although rigid, H.B. 421 comports with the standard of care. *Id.* Under those circumstances, H.B. 421 is a rational legislative enactment.

The record does not support a conclusion that H.B. 421 imposes substantial obstacles to women who seek abortions.

B. *The Judicial Bypass for Minors*

 As stated, H.B. 421 amends the current law regulating abortions for minors by changing from a parental notice requirement to a parental consent requirement. Additionally, H.B. 421 eliminates the minor's ability to avoid obtaining parental consent by establishing that she is a victim of a pattern of abuse. Finally, H.B. 421 specifically limits the juvenile court's jurisdiction to presiding over only one bypass hearing per pregnancy. The Court concludes that H.B. 421 does not impose a substantial obstacle to minors who seek abortions.

 The state may enact a parental consent statute as long as it gives the minor an opportunity to demonstrate that she is mature and well enough informed in consultation with a physician to make the decision to have an abortion independent of her parents' wishes, or that an abortion would otherwise be in her best interests. *Bellotti v. Baird,* 443 U.S. 622, 643–44, 99 S.Ct. 3035, 61 L.Ed.2d 797 (1979). The state must also ensure the minor's anonymity is preserved and the appeals process is completed quickly enough to provide an effective opportunity to obtain an abortion. *Id.* H.B. 421 satisfies each of these requirements. H.B. 421 allows a minor to forego parental consent if she establishes that she is mature enough to proceed without consent or that an abortion is in her best interests. Additionally, H.B. 421 and the appellate rules implemented by the Supreme Court of Ohio ensure that the entire judicial bypass process is completed sixteen days after the date the minor files her bypass petition.[9]

9. H.B. 421 requires the juvenile court to hear the minor's petition within five days of filing.

Under rules implemented by the Supreme Court of Ohio, the entire process, including

Finally, H.B. 421 maintains the confidentiality of the proceedings by requiring that the proceeding be conducted in a confidential manner and provides that the records of the proceeding are not public records under Ohio law.[10]

Plaintiff's primary complaint about H.B. 421 is that it does not permit a minor to file second or subsequent bypass petitions on the same pregnancy. Nevertheless, the Court finds that this restriction does not impose an undue burden on minors. Contrary to Plaintiffs' argument, this Court finds nothing in *Bellotti* that requires the state to afford a minor virtually unlimited opportunities to petition for a bypass. In a footnote, the *Bellotti* Court did state that the "opportunity for direct access to the court which we have described is adequate to safeguard throughout pregnancy the constitutionally protected interest of a minor in the abortion decision." *Bellotti*, 443 U.S. at 651 n. 31, 99 S.Ct. 3035. The Court, however, made this statement in the context of explaining why it did not have to develop a different set of bypass procedures for minors who seek abortions in the latter stages of pregnancy. In other words, the *Bellotti* Court was only stating that its bypass procedures were sufficient to protect the minor's interest in the abortion decision regardless of the stage of her pregnancy. This statement, however, is far short of a mandate that the state provide minors with limitless opportunities to petition for a bypass. Moreover, such a requirement would conflict with *Casey* in that the state could completely prohibit minors from even obtaining an abortion except where necessary to preserve the life or health of the minor. *Casey*, 505 U.S. at 879, 112 S.Ct. 2791.

Nevertheless, the Court concludes that H.B. 421's limitation on subsequent bypass petitions does not impose any undue burden even in the pre-viability context. To conclude otherwise, the Court would have to base its decision on conjecture, speculation, and supposition. For instance, Plaintiffs argue that H.B. 421 would not allow a minor whose petition was denied to return to the court after she became better educated on the health issues which surround the abortion decision. This argument would have some force if in fact this was a dispositive consideration for courts faced

---

appellate review and issuance of the decision, must be completed within sixteen calendar days (which includes intervening Saturdays, Sundays, and holidays) from the date of the filing of the original complaint. Ohio R.App. P. 11.2(B)(2). This time frame is well-within *Bellotti's* expediency requirement. *Manning v. Hunt*, 119 F.3d 254, 272 (4th Cir.1997) (judicial bypass constitutional under *Bellotti* where statute mandated that hearing and appeal be completed within seventeen days); *Glick v. McKay*, 937 F.2d 434, 440 (9th Cir. 1991), *overruled on other grounds, Lambert v. Wicklund*, 520 U.S. 292, 117 S.Ct. 1169, 137 L.Ed.2d 464 (1997), ("While a seventeen or twenty-two day bypass procedure period satisfies the *Bellotti* requirement that the courts must conduct a bypass procedure with expediency to allow the minor an effective opportunity to obtain an abortion, an indefinite period does not.").

10. Plaintiffs argue that confidentiality is not ensured because H.B. 421 does not provide an exemption for reporting abuse as required under Ohio Rev.Code § 4121.42.1. Plaintiffs overlook, however, that § 4121.42.1 has its own requirements to preserve the confidentiality of reports of abuse and the information contained in them. *See* Ohio Rev.Code §§ 4121.42.1(H)(1) & (2). Moreover, complete anonymity is not required under *Bellotti*. *Akron*, 497 U.S. at 513, 110 S.Ct. 2972; *Planned Parenthood of S. Az. v. Lawall*, 307 F.3d 783, 788 (9th Cir.2002). The state is only required to take reasonable steps to prevent the *public*, not other governmental officials, from learning the minor's identity. *Akron*, 497 U.S. at 513, 110 S.Ct. 2972. H.B. 421 plainly meets the confidentiality requirement of *Bellotti* even if certain persons, including attorneys, are required to report abuse under § 4212.42.1.

with a rendering bypass decisions. In fact, Ohio courts apparently consider a number of factors in deciding whether a minor is sufficiently mature to decide to have an abortion without parental involvement, only one of which is the minor's understanding of the medical implications of the procedure. *See, e.g., In re Jane Doe*, Case No. C–050133, 2005 WL 736666, at *2 (Ohio Ct.App. Apr.1, 2005).[11] In order to find an undue burden under the example proffered by Plaintiffs, the Court would have to speculate that a large fraction of minors have their bypass petitions denied solely because of their lack of understanding of the medical consequences of an abortion, to the exclusion of any other consideration, or that on a re-petition the minor's newfound understanding of the medical consequences of the procedure would tip the balance in her favor. No evidence in the record supports either of these conclusions and it is only speculation that being able to file successive petitions in the juvenile court would result in a different outcome.

Plaintiffs also complain that H.B. 421's bypass procedures would prevent minors who develop later-term fetal anomalies from petitioning for a judicial bypass. Although the record establishes that fetal anomalies occur in about 3% of all pregnancies and that most fetal anomalies are not detected until the second trimester, Findings of Fact 25, 26, *supra*, at 24, again it is only speculation that a large fraction of minors who develop fetal anomalies in the second trimester will have already filed a petition for a bypass of parental consent. The Court notes further that minors typically are not candidates for amniocentesis and, therefore, it is unlikely that minor who has already filed one petition for a bypass, will randomly decide that an amniocentesis required, and further unlikely that the test will show a fetal anomaly. *See* http://www.medicinenet.com/amniocentesis/page2.htm (visited August 29, 2005) (indicating that the typical candidates for amniocentesis are women over age 35 or women with a family history of fetal defects or prior births with chromosomal defects). Moreover, the fact that a minor discovers she has a fetal anomaly at all leads one to conclude that she has access to prenatal health care, which leads one to conclude further that she has a parent or guardian involved in her pregnancy to pay the medical bills. At that point of the analysis, the minor's confidentiality is no longer implicated and it would only be speculation to assume that a large fraction of parents or guardians, knowing of these defects, would not consent to the minor's abortion.[12]

Plaintiffs argue that the H.B. 421's judicial bypass is unconstitutional because it does not provide a mental health exception to its provisions. H.B. 421 states:

It is an affirmative defense to any civil, criminal, or professional disciplinary claim brought under this section that

---

11. In *Doe*, the court observed that the following factors were relevant for consideration: 1) the minor's age, 2) overall intelligence, 3) emotional stability, 4) credibility and demeanor as a witness, 5) ability to accept responsibility, 6) ability to assess the future impact of her present choices, 7) ability to understand the medical consequences of abortion and apply that understanding to her decision, and 8) any undue influence by another on the minor's decision. *Id.*

12. An argument could be made that the Court is only speculating about the minor's access to prenatal care. Perhaps, but speculation is the coin of realm in this case. But since Plaintiffs base their argument on a hypothetical minor who has already lost one bypass petition and who then discovers that she has a fetal anomaly, it is fair to flesh out all of the relevant circumstances of the hypothetical minor, including how she most likely would have become aware of the anomaly.

compliance with the requirements of this section was not possible because an immediate threat of serious risk to the life or physical health of the minor from the continuation of her pregnancy created an emergency necessitating the immediate performance or inducement of an abortion.

Plaintiffs rightly observe that this provision does not provide an exception to the parental or judicial consent provision where necessary to preserve the minor's mental health. Nevertheless, the Court finds that the absence of a mental health exception, under these circumstances, does not render H.B. 421 unconstitutional. In *Voinovich,* the Court held that where the state proscribes post-viability abortions, it must provide an exception where an abortion is necessary to prevent the woman from sustaining severe, irreversible mental or emotional harm. *See Voinovich,* 130 F.3d at 209–10. This case is distinguishable from *Voinovich,* however, because H.B. 421 does not proscribe any from or method of performing an abortion. Rather, it simply requires a physician to obtain parental or judicial consent before performing an abortion on minor, unless in an emergency situation, there is a serious risk of physical harm to the minor. Nothing in H.B. 421, however, precludes a minor from establishing through a bypass proceeding that it would be in her best interests to obtain an abortion without parental consent because of her mental health condition. In contrast, under the complete ban on abortions at issue in *Voinovich,* a woman was completely foreclosed from establishing that her mental health condition necessitated having an abortion. Plaintiffs have not adduced any evidence which demonstrates that there are any emergency situations in which the risks to the minor's mental health dictate the immediate performance of an abortion without obtaining parental or judicial consent. Thus, this case is more like *Taft,* in which the Court held that Ohio's ban on partial birth abortion was not required to contain a mental health exception unless the plaintiff could demonstrate that she would suffer severe and irreversible harm mental harm from being limited to a D & E procedure when she or her physician might prefer a D & X procedure. *Taft,* 353 F.3d at 448 n. 1 (noting that plaintiffs failed to show that such mental harm was even possible, much less likely).

 H.B. 421 is not unconstitutional because its maternal health exception is cast in the form of an affirmative defense rather than as outright exception to its consent provisions. As Defendants correctly argue, *Voinovich,* upon which Plaintiffs rely, did not hold that an abortion regulation is unconstitutional if its maternal health exception is promulgated in the form of an affirmative defense. Rather, in *Voinovich,* the Court stated that the availability of an affirmative defense to the ban on partial birth abortion played no part in its analysis because the undue burden lay in the fact that the law banned the most common method of second trimester abortions. *Voinovich,* 130 F.3d at 201. In other words, the *Voinovich* Court did not opine on the adequacy of the maternal exception per se, but rather held that the affirmative defense did not remove the obstacle created by the ban. In contrast, in this case, H.B. 421 does not create any undue burdens which the affirmative defense cannot ameliorate. Construed in a manner most favorable to sustaining the constitutionality of H.B. 421,[13] a physician is entitled to use his or her reasonable judgment that a medical emergency neces-

---

**13.** In *Taft,* the Court reminded us that courts have a duty to resort to every reasonable construction to save a statute from unconstitutionality. *Taft,* 353 F.3d at 449.

sitates the immediate performance of an abortion.[14] The Court's own research has not developed any case law which states that a maternal health exception is inadequate solely for the fact that it is enacted as an affirmative defense. Moreover, in *Simopoulos v. Virginia*, 462 U.S. 506, 103 S.Ct. 2532, 76 L.Ed.2d 755 (1983), a case which involved a criminal prosecution for performance of an illegal abortion, the Court stated that "[p]lacing upon the defendant the burden of going forward with evidence on an affirmative defense is normally permissible." *Id.* at 510, 103 S.Ct. 2532.[15] Accordingly, the Court concludes that the maternal health exception is adequate.

Plaintiffs argue that H.B. 421 violates the open court provision of Article I, Section 16 of the Ohio Constitution. Plaintiffs, however, did not plead this claim in their complaint. To the extent there may have been a constructive amendment of the complaint, upon finding that H.B. 421 does not create any undue burdens on the abortion right, the Court declines to exercise subject matter over this claim. *Pilgrim v. Littlefield*, 92 F.3d 413, 417 (6th Cir.1996).

In summary, for the reasons stated, the Court finds that H.B. 421 does not impose an undue burden on minors who seek abortions.

### Conclusion

In conclusion, the Court finds that H.B. 421 does not impose any undue burdens on the abortion right. Accordingly, the Court grants judgment on the complaint in favor of the Defendants. The agreed order (Doc. No. 6) enjoining enforcement of H.B. 421 is hereby **DISSOLVED**. To the extent Plaintiffs alleged that H.B. 421 violates the constitution of the State of Ohio, the claim is **DISMISSED WITHOUT PREJUDICE**.

**IT IS SO ORDERED.**

---

**14.** Plaintiffs argue that this medical exception does not allow a physician to resort to his or her good faith medical judgment in proceeding without parental or judicial consent. The Court acknowledges that this section does not specifically reference the physician's medical judgment, but the language otherwise used so closely tracks the definition of "medical emergency" in § 2317.56(1), which does reference the judgment of the physician, that it is reasonable to conclude that the General Assembly did not intend to deny physicians this affirmative defense where their reasonable medical judgment led them to conclude that the minor's life or health was at risk.

**15.** Contrary to Plaintiffs' assertion, the Court does not understand H.B. 421 to allow the prosecution to convict a physician merely upon proof that he or she performed an abortion on a minor. As the Court reads § 2919.121(B), the prosecution would have to plead and prove beyond a reasonable doubt that the physician performed an abortion on a minor knowing that she was not emancipated, had not secured either her informed consent or her parent or guardian's informed written consent, or had not obtained judicial consent. *See United States v. Vuitch*, 402 U.S. 62, 70, 91 S.Ct. 1294, 28 L.Ed.2d 601 (1971). The affirmative defense—that the risk to the minor's life or health necessitated immediate performance of the abortion without complying with the consent procedures—does not improperly shift the burden of proof to the physician because the defense does not negate any of the elements the prosecution must prove. *See Patterson v. New York*, 432 U.S. 197, 210, 97 S.Ct. 2319, 53 L.Ed.2d 281 (1977) (prosecution is not required to disprove beyond a reasonable doubt every fact constituting an affirmative defense). The *Voinovich* Court distinguished *Simopoulos* in a footnote. *See Voinovich*, 130 F.3d at 201 n. 13. This footnote is dicta, however, because the Court specifically stated that the affirmative defense did not affect its analysis of the undue burden created by the ban on partial birth abortion. *See id.* at 201.