*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206
File Name: 06a0419p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

---

CINCINNATI WOMEN'S SERVICES, INC.; WALTER
BOWERS, Dr.,

                *Plaintiffs-Appellants,*

     *v.*

ROBERT TAFT, Governor of Ohio; BETTY D.
MONTGOMERY, Attorney General; JOSEPH DETERS;
MICHAEL K. ALLEN; JIM PETRO,

                *Defendants-Appellees.*

No. 05-4174

---

Appeal from the United States District Court
for the Southern District of Ohio at Cincinnati.
No. 98-00289—Sandra S. Beckwith, Chief District Judge.

Argued: February 1, 2006

Decided and Filed: November 13, 2006

Before: COLE, GIBBONS, and ROGERS, Circuit Judges.

---

## COUNSEL

**ARGUED:** Alphonse A. Gerhardstein, GERHARDSTEIN & BRANCH, Cincinnati, Ohio, for Appellants. Diane Richards Brey, OFFICE OF THE ATTORNEY GENERAL OF OHIO, Columbus, Ohio, for Appellees. **ON BRIEF:** Alphonse A. Gerhardstein, Jennifer L. Branch, GERHARDSTEIN & BRANCH, Cincinnati, Ohio, David A. Friedman, FERNANDEZ FRIEDMAN GROSSMAN KOHN & SON, Louisville, Kentucky, for Appellants. Diane Richards Brey, Stephen P. Carney, Douglas R. Cole, OFFICE OF THE ATTORNEY GENERAL OF OHIO, Columbus, Ohio, Anne Berry Strait, Tracy M. Greuel, OFFICE OF THE ATTORNEY GENERAL, CHARITABLE LAW SECTION, Columbus, Ohio, for Appellees.

     COLE, J., delivered the opinion of the court, in which GIBBONS, J. joined. ROGERS, J. (pp. 11-14), delivered a separate concurring opinion.

---

## OPINION

---

     R. GUY COLE, JR., Circuit Judge. In this facial constitutional attack, Plaintiffs-Appellants Cincinnati Women's Services ("CWS") and Dr. Walter Bowers, CWS's medical director, appeal the district court's judgment upholding two provisions of Ohio House Bill 421, a law enacted by the

1

Ohio General Assembly in 1998 concerning the regulation of abortions. The first of these provisions limits minors seeking a judicial bypass of the statutory parental-consent requirement to one petition per pregnancy ("Single-Petition Rule"). The second challenged provision requires women seeking abortions to attend, for informed-consent purposes, an in-person meeting with a physician at least twenty-four hours prior to receiving the abortion ("In-Person Rule"). Following a bench trial, the district court granted judgment in favor of the Defendants.

For the following reasons we **REVERSE** the district court's judgment that the Single-Petition Rule is constitutionally valid and conclude that the Single-Petition Rule is severable from the remainder of the statute. Further, we **AFFIRM** the district court's judgment that the In-Person Rule is constitutionally valid and **REMAND** for further proceedings consistent with this opinion.

## I. Background

### A. Factual Background

In 1998, the Ohio General Assembly made various substantive changes to Ohio's law regulating abortion, two of which are at issue in this case: the Single-Petition Rule and the In-Person Rule. *See Cincinnati Women's Servs. v. Taft*, No. 1:98-CV-289, 2005 U.S. Dist. LEXIS 23015, at *1-*2 (S.D. Ohio Sept. 8, 2005).

Until 1998, Ohio law did not impose any restrictions upon the number of times a minor woman could petition for a judicial bypass of the prior parental-notification rule. The 1998 amendments, however, included the Single-Petition Rule, which limits to once per pregnancy the number of times a minor may seek a judicial bypass in lieu of parental consent. Ohio law makes it a misdemeanor and a tort for any person to perform an abortion on an unemancipated minor unless the attending physician has "secured the written informed consent of the minor and one parent, guardian, or custodian." Ohio Rev. Code § 2919.121(B)(1) (2005).[1] The statutory amendment permits a minor woman to petition a juvenile court for a judicial bypass of parental consent if "the court finds that the minor is sufficiently mature and well enough informed to decide intelligently whether to have an abortion" or that "the abortion is in the best interests of the minor." *Id.* § 2919.121(C)(3). The Single-Petition Rule further provides that "[n]o juvenile court shall have jurisdiction to rehear a petition concerning the same pregnancy once a juvenile court has granted or denied the petition." *Id.* § 2919.121(C)(4).

In evaluating the probable impact of the Single-Petition Rule, the district court found that "[m]ost judicial bypasses occur in the first trimester of a minor's pregnancy." *Taft*, 2005 U.S. Dist. LEXIS 23015, at *27. The district court also found that "there have been times when it was apparent that a bypass was denied because the minor failed by oversight to adequately discuss facts that the minor knew or could easily learn." *Id.* at *28. One witness, a part-time magistrate in the Cuyahoga County Juvenile Court in Cleveland, testified that in such situations he has advised the minor's attorney to file another bypass petition during the same pregnancy. *Id.* at *27-*28.

The 1998 statutory amendment also modifies prior law by requiring women seeking abortions to attend an in-person meeting with a physician for informed-consent purposes. *See* Ohio Rev. Code § 2317.56(B)(1) (2005). "The meeting need not occur at the facility where the abortion is to be performed or induced, and the physician involved in the meeting need not be affiliated with that facility or with the physician who is scheduled to perform or induce the abortion." *Id.* Although Ohio's prior abortion regulation required informed consent before a woman underwent an abortion, the law did not contain any requirement that the meeting take place in person. *See* Ohio

---

[1] The 1998 statutory amendment also changed Ohio law by requiring parental *consent* instead of parental *notice*, but this aspect of the law is not before us.

Rev. Code § 2317.56(B)(1) (1997) ("At least twenty-four hours prior to the performance or inducement of the abortion, a physician informs the pregnant woman, verbally or by other nonwritten means of communication . . . ."). Ohio's Attorney General issued an opinion in 1994 interpreting the older version of section 2317.56(B)(1) to permit videotaped or audiotaped physician statements. *See* 1994 Ohio Op. Att'y Gen. No. 94-094, 1994 WL 725885. The challenged provision thus changed the status quo to require that a woman seeking an abortion receive informed consent in-person, by any physician, rather than "verbally or by other nonwritten means." *Id.*

CWS is a healthcare provider that provides contraceptive services and performs pregnancy testing and abortions. *See Taft*, 2005 U.S. Dist. LEXIS 23015, at *19. When a woman inquires about obtaining an abortion from CWS, her first contact is generally by phone. *Id.* at *20. CWS employees inform her of CWS's abortion process and invite her to schedule two appointments. *Id.* "The first appointment is for an informed consent visit and the second appointment is for an actual procedure." *Id.*

In evaluating the impact of the In-Person Rule on CWS, the district court found that the In-Person Rule will have the practical effect of requiring all of CWS's own clients to come to its premises twice, once for the informed-consent meeting with a physician affiliated with CWS, and a second time for the procedure. *See id.* at *12, *20, *36, *39. The district court found that CWS currently excuses approximately 5 to 10 percent of its patients from its normal two-visit protocol. *Id.* at *24. "Some women are excused from coming because of the distance of their residencies from the clinic, their lack of resources, or because of interference from an abusive partner." *Id.* The district court found that 7 to 18 percent of those excused by CWS are excused because of "partner abuse." *Id.* Excused patients "receive all the information about the procedure via mail and are given the opportunity to listen to an audio version" of the informed consent video tape, and to speak with CWS's "patient advocates." *Id.* Witnesses from two other abortion clinics — Capital Care clinic in Columbus and Center for Choice clinic in Toledo — testified that their clinics excuse 5 to 10 percent of their patients from their own two-visit protocols. *Id.* at *25. Twenty to 25 percent of this excused group are "abused women." *Id.*

## B.  Procedural Background

Several weeks before the Act's effective date, CWS filed a pre-enforcement facial attack against two of the Act's provisions, naming the Governor of Ohio and various other government officials as defendants. *Taft*, 2005 U.S. Dist. LEXIS 23015, at *3. CWS sought injunctive and declaratory relief on the grounds that the statutory provisions are unconstitutionally vague and invalid under Supreme Court precedent. Following a bench trial, the district court upheld both provisions. With respect to the Single-Petition Rule, the district court reasoned that Supreme Court precedent does not "require[] the state to afford a minor virtually unlimited opportunities to petition for a bypass." *Id.* at *46. Assuming that striking down the Single-Petition Rule would mandate "limitless opportunities to petition for a bypass" during the same pregnancy, the district court determined that "such a requirement would conflict with *Casey* in that the state could completely prohibit minors from even obtaining an abortion except where necessary to preserve the life or health of the minor." *Id.* at *46-*47 (citing *Planned Parenthood of Se. Pa. v. Casey*, 505 U.S. 833, 879 (1992)).

The district court also held that the Single-Petition Rule "does not impose any undue burden even in the pre-viability context." *Id.* at *47. To find otherwise, the district court concluded that it would have to engage in speculation and guesswork about the following: (1) what fraction of subsequent petitioners' bypass petitions had been denied due to a lack of understanding of the abortion procedure; (2) whether a petitioner's increased understanding in a second proceeding would be enough to tip the balance in favor of granting a bypass; and (3) what proportion of subsequent petitioners would develop fetal anomalies after an unsuccessful petition in the first trimester (the

district court concluded that a minor who discovered such a fetal anomaly likely had access to prenatal care, "which leads one to conclude further that she has a parent or guardian involved in her pregnancy to pay the medical bills"). *See id.* at *47-*50. The district court also determined that it would be pure speculation to conclude that a large fraction of parents would withhold consent for an abortion from a minor. *See id.* at *50. Finally, the district court held that the Single-Petition Rule need not contain a mental-health exception, and that the general maternal-health exception was constitutional even though it had been "promulgated in the form of an affirmative defense." *See id.* at *51-*52, *53.

Likewise, the district court upheld the In-Person Rule because it "does not create a substantial obstacle for women seeking abortions." *Id.* at *29. While granting that the In-Person Rule could have the effect of delaying abortions up to two weeks, the district court held that a "delay of up to two weeks, however, does not impose an undue burden on women seeking abortions." *Id.* at *30. The district court relied on the Supreme Court's ruling in *Casey*, which upheld Pennsylvania's similar informed-consent statute.

Addressing the "most difficult question to answer," the district court rejected CWS's argument that the In-Person Rule would increase the probability that abusive partners would learn about the pregnancy or the attempt to obtain an abortion, thereby causing an undue burden on the abortion-seeking woman's constitutional right to an abortion. *See id.* at *39. After reviewing the testimonial and record evidence received at trial, the district court concluded that the evidence did not establish what proportion of the abused women would be blocked from obtaining abortions. *See id.* at *39-*42. The district court thus concluded that it could not strike down the In-Person Rule under *Casey*'s "large fraction" test. *See id.* at *41.

This timely appeal followed. Enforcement of the Single-Petition Rule, but not the In-Person Rule, has been enjoined pending resolution of this appeal.[2]

## II. The Large Fraction Test

*Planned Parenthood of Se. Pa. v. Casey*, 505 U.S. 833 (1992), sets the standard that we are bound to apply in facial challenges to abortion restrictions. In *Casey*, the Supreme Court set forth the test that must be applied in analyzing whether a restriction placed on a woman's constitutional right to an abortion is an "undue burden" on that right, thereby rendering the restriction facially unconstitutional. *Id.* at 878, 894–95. The Supreme Court determined that, because "[l]egislation is measured for consistency with the Constitution by its impact on those whose conduct it affects," when analyzing abortion restrictions, "[t]he proper focus of constitutional inquiry is the group for whom the law is a restriction, not the group for whom the law is irrelevant." *Id.* at 894. Therefore, if, "in a large fraction of the cases in which [the abortion restriction] is relevant, it will operate as a substantial obstacle to a woman's choice to undergo an abortion," then reviewing courts should find that the restriction is an "undue burden, and therefore invalid." *Id.* at 895. This test has come to be known as the *Casey* "large fraction" test.

---

[2] Slightly more than a week after CWS filed its complaint, the parties agreed to an order maintaining the status quo — i.e., the state of the law prior to the 1998 amendments — in the form of a preliminary injunction. When the district court entered its final judgment dismissing the case on September 8, 2005, the preliminary injunction was dissolved. The next day the district court issued another order suspending dissolution of the injunction for two weeks. CWS filed a notice of appeal on September 16, 2005. When the order suspending dissolution of the injunction ran its course, the district court, on September 22, 2005, denied CWS's motion to stay the judgment pending appeal.

On October 3, 2005, this Court granted in part and denied in part CWS's motion to enjoin enforcement of the Act pending appeal. We enjoined enforcement of the Single-Petition Rule, but in all other respects, we denied the motion.

In the intervening decade, the Supreme Court has not abandoned *Casey*. *See, e.g., Planned Parenthood v. Casey*, 510 U.S. 1309, 114 S. Ct. 909, 910 (1994) (Souter, J., denying application for stay of mandate) (if an abortion restriction interposes a substantial obstacle on a large fraction of the affected population, it is an unconstitutional violation of "the exercise of the right to reproductive freedom guaranteed by the Due Process Clause and affirmed in th[e] Court's *Casey* opinion" (citations omitted)); *Fargo Women's Health Org. v. Schafer*, 507 U.S. 1013, 1014 (1993) (O'Connor, J., concurring) ("[W]e made clear that a law restricting abortions constitutes an undue burden, and hence is invalid, if, in a large fraction of the cases in which [the law] is relevant, it will operate as a substantial obstacle to a woman's choice to undergo an abortion." (internal citation to *Casey* omitted)).[3]

In *United States v. Salerno*, 481 U.S. 739, 745 (1987), the Supreme Court held that, to succeed in a facial constitutional challenge, "the challenger must establish that no set of circumstances exists under which the [law] would be valid." However, in considering facial challenges to abortion restrictions, every circuit, with one exception, has applied *Casey's* test rather than *Salerno's* more restrictive "no set of circumstances" test. *See Nat'l Abortion Fed'n v. Gonzales*, 437 F.3d at 294 (Walker, Jr., C.J., concurring) ("As it stands now, however, the Supreme Court appears to have adopted the 'large fraction' standard . . . for those who seek to challenge an abortion regulation as facially unconstitutional."); *Richmond Med. Ctr. for Women v. Hicks*, 409 F.3d 619, 628 (4th Cir. 2005) (holding that "*Salerno*'s 'no set of circumstances' standard does not apply in the context of a facial challenge . . . to a statute regulating a woman's access to abortion"); *Planned Parenthood v. Heed*, 390 F.3d 53, 57 (1st Cir. 2004), *vacated on other grounds by Ayotte v. Planned Parenthood*, 126 S. Ct. 961 (2006) (determining that *Casey*'s large-fraction test is properly applied to facial abortion-restriction challenges); *A Woman's Choice-E. Side Women's Clinic v. Newman*, 305 F.3d 684, 687, 698–99 (7th Cir. 2002) (an abortion restriction "will be deemed valid unless, in a large fraction of the cases in which the law is relevant, it will operate as a substantial obstacle to a woman's choice to undergo abortion" (internal citation omitted)); *Planned Parenthood of Cent. N.J. v. Farmer*, 220 F.3d 127, 142-43 (3d Cir. 2000) ("a plaintiff must show that an abortion regulation would be an undue burden in a large fraction of the cases in which that regulation is relevant"); *Planned Parenthood of S. Ariz. v. Lawall*, 180 F.3d 1022, 1027, *amended on denial of reh'g*, 193 F.3d 1042 (9th Cir. 1999) (following the "great weight of circuit authority holding that *Casey* has overruled *Salerno* in the context of facial challenges to abortion statutes"); *Jane L. v. Bangerter*, 102 F.3d 1112, 1116 (10th Cir. 1996) (noting that the *Casey* Court "did not apply" the *Salerno* test, but rather "evaluated the regulations under the undue burden standard"); *Planned Parenthood, Sioux Falls Clinic v. Miller*, 63 F.3d 1452, 1456-58 (8th Cir. 1995) (opting

---

[3] Justice Thomas's dissent in *Stenberg v. Carhart*, 530 U.S. 914 (2000), takes to task the *Stenberg* majority for not applying *Casey*'s large-fraction test and implicitly argues that the Court has abandoned the large-fraction test. *Id.* at 1019–20 (Thomas, J., dissenting). *Cf. Nat'l Abortion Fed'n v. Gonzales*, 437 F.3d 278, 294 (2d Cir. 2006) (Walker, Jr., C.J., concurring) ("[T]he Supreme Court appears to have adopted the 'large fraction' standard (perhaps modified by *Stenberg* to mean a 'not-so-large fraction' standard) for those who seek to challenge an abortion regulation as facially unconstitutional."). However, Justice Thomas's criticism is misplaced. The holding in *Stenberg* relating to whether the abortion restriction before the Court was an undue burden hinged entirely on statutory interpretation. *Stenberg*, 530 U.S. at 938; *see also id.* at 938–46. In *Stenberg*, the state of Nebraska acknowledged that the statute in question placed an undue burden on a woman's right to an abortion if it was interpreted in a certain way — the way the Supreme Court eventually interpreted it. *Id.* Because the state conceded that the statute was an undue burden if interpreted a certain way, the Court did not need to undertake the large-fraction analysis. *See Planned Parenthood of Idaho, Inc. v. Wasden*, 376 F.3d 908, 921 n.10 (9th Cir. 2004) ("The abortion-specific 'large fraction' standard is part and parcel of the undue burden analysis."). Finally, the *Stenberg* Court affirmed the Eighth Circuit's decision *in toto*, *Stenberg*, 530 U.S. at 946, which itself used *Casey*'s large-fraction test, *see Carhart v. Stenberg*, 192 F.3d 1142, 1149 (8th Cir. 1999); *see also id.* at 1151 (Because "[a]n abortion regulation that inhibits the vast majority of second trimester abortions would clearly have the effect of placing a substantial obstacle in the path of a woman seeking a pre-viability abortion" and the restriction here "prohibit[s] the most common procedure for second-trimester abortions," it thereby causes "an undue burden on a woman's right to choose to have an abortion." (quotation omitted)).

to "follow what the Supreme Court actually did — rather than what it failed to say — and apply the undue-burden test" which requires a court to invalidate an abortion restriction if the law "operate[s] as a substantial obstacle to a woman's choice to undergo an abortion in a large fraction of the cases in which [it] is relevant" (quotation omitted)). The Fifth Circuit stands alone in its rejection of the large fraction test. *See Barnes v. Moore*, 970 F.2d 12, 14 (5th Cir. 1992) (holding that a plaintiff must "establish that no set of circumstances exists under which the Act would be valid" (quoting *Salerno*, 481 U.S. at 745)).[4]

Like the majority of other circuits, this Court too has followed *Casey*'s large-fraction test in analyzing facial attacks on abortion regulations. In deciding whether a pre-viability abortion restriction passes facial constitutional muster, we "determine whether 'in a large fraction of the cases in which [the ban] is relevant, it will operate as a substantial obstacle to a woman's choice to undergo an abortion.'" *Women's Med. Prof'l Corp. v. Voinovich*, 130 F.3d 187, 196 (6th Cir. 1997) (quoting *Casey*, 505 U.S. at 895). This has been our repeated and continuous practice. *See, e.g., Women's Med. Prof'l Corp. v. Baird*, 438 F.3d 595, 607 (6th Cir. 2006) (following *Casey*'s holding that "a regulation is an undue burden if 'in a large fraction of the cases in which [the regulation] is relevant, it will operate as a substantial obstacle to a woman's choice to undergo an abortion'" (quoting *Casey*, 505 U.S. at 895)); *Memphis Planned Parenthood v. Sundquist*, 175 F.3d 456, 477 n.3 (6th Cir. 1999) ("When considering [whether a] statute [that regulates abortion] is unconstitutional on its face, we must analyze the factual record to determine whether the challenged regulation in a *large fraction* of the cases in which it is relevant, will operate as a substantial obstacle to a woman's choice to undergo an abortion" (citing *Casey*, 505 U.S. at 895) (emphasis added)); *see also Women's Med. Prof'l Corp. v. Taft*, 353 F.3d 436, 443, 446 (6th Cir. 2003) (holding that "a state may regulate abortion before viability as long as it does not impose an 'undue burden' on a woman's right to terminate her pregnancy," and that "an 'undue burden' exists when 'a state regulation has the purpose or effect of placing a substantial obstacle in the path of a woman seeking an abortion of a nonviable fetus'" (citing *Casey*, 505 U.S. at 876–77)).

Thus, our path is clear: We must follow *Casey's* large-fraction test in analyzing the facial challenge to the two abortion restrictions before us. Accordingly, we asses whether Ohio's abortion restrictions present a substantial obstacle to obtaining an abortion for a large fraction of the women for whom the restrictions are relevant. *Casey*, 505 U.S. at 895.

### III.  The Single-Petition Rule

#### A.  Constitutionality of the Single-Petition Rule

If a state requires parental consent before an unemancipated minor woman receives an abortion, it must provide for a judicial or administrative procedure so that a minor woman who satisfies certain conditions may bypass the consent requirement. *See Bellotti v. Baird*, 443 U.S. 622, 647–51 (1979) (plurality opinion) ("*Bellotti II*"). If a minor woman establishes either "that she is mature enough and well enough informed to make the abortion decision independently" or "that the abortion would be in her best interests," the reviewing court or agency must issue the bypass. *Lambert v. Wicklund*, 520 U.S. 292, 295 (1997) (citation omitted). Otherwise, the attendant bypass procedure is constitutionally invalid. *See Bellotti II*, 443 U.S. at 643–44.

Ohio provides for a judicial-bypass procedure that apparently encompasses the procedural requirements set forth in *Lambert* and *Bellotti II*. Ohio, however, seeks to limit a minor woman to filing one petition for a bypass per pregnancy. The Supreme Court has never determined whether

---

[4] Interestingly, even the Fifth Circuit's cases are inconsistent on this issue. *Compare Sojourner T. v. Edwards*, 974 F.2d 27, 30 (5th Cir. 1992) (applying *Casey*'s undue burden test without reference to *Salerno*), with *Barnes*, 970 F.2d at 14 & n.2 (5th Cir. 1992) (per curiam) (applying *Salerno* to a facial attack on an abortion regulation).

an abortion restriction preventing a minor woman from filing multiple bypass petitions violates the Constitution. We must, therefore, analyze whether Ohio's restriction to the judicial-bypass procedure constitutes an undue burden under *Casey*'s large-fraction test.

In *Casey*, the Supreme Court analyzed a spousal-notification law that required a married woman who wished to abort her pregnancy to first notify her husband, unless she fit into a statutorily exempted category. *Casey*, 505 U.S. at 887–88. The Supreme Court held that, in determining whether this restriction was an undue burden, the "proper focus of constitutional inquiry is the group for whom the law is a restriction, not the group for whom the law is irrelevant." *Id*. at 894. Therefore, while the restriction ostensibly affected all married women seeking an abortion, the spousal-notification restriction was only relevant to married women seeking an abortion who did not fit into a statutory exception to the notification requirement and did not desire to inform their husbands about the abortion. *Id*. at 894–95. Of the women for whom the restriction was actually relevant, many of whom were at risk for spousal abuse, the restriction would "operate as a substantial obstacle" to a "large-fraction." *Id*. *Casey* thus requires courts to determine whether a large fraction of the women "for whom the law is a restriction" will be "deterred from procuring an abortion as surely as if the [government] has outlawed abortion in all cases." *Id*. at 894. The spousal-notification law in *Casey* was facially unconstitutional because it satisfied that test. *Id*. at 895.

Applying *Casey* to the Single-Petition Rule before us, we find that the group of women for whom the restriction actually operates are women who are denied a bypass and who have changed circumstances such that if they were able to reapply for a bypass, it would be granted. The group of women who will be deterred from procuring an abortion because of the restriction are women with changed circumstances who would apply for another bypass if allowed. The record shows that second petitioners exist under Ohio's current bypass scheme, and that practically all second petitioners allege changed circumstances such that, if believed, a reviewing court must issue a bypass. The changed circumstances that affect abortion-seeking minors include increased maturity, increased medical knowledge about abortion, and pregnant minors who discover that their fetus has a medical anomaly such as gastroschisis.[5] The record further shows that most women who are denied a bypass but who experience a change in their circumstances will subsequently seek another bypass procedure. Because Ohio's law preventing more than one petition per procedure acts as a substantial obstacle to a woman's right to an abortion in a large fraction of the cases in which the single petition is relevant, we find that the Single-Petition Rule is an undue burden and, therefore, is facially unconstitutional.

In sum, because the Single-Petition Rule fails under *Casey*'s large-fraction test, we hold that it is facially unconstitutional.

## B. Severability of the Single-Petition Rule

The Single-Petition Rule is severable from the remainder of Ohio's statute regulating abortion. Therefore, our finding that the Single-Petition Rule does not survive constitutional scrutiny is not fatal to the remainder of the regulations.

In *Ayotte v. Planned Parenthood of N. New Eng.,* 126 S.Ct. 961, 964 (2006), the Supreme Court held that a reviewing court need not invalidate an entire statute when the court "may be able to render narrower declaratory and injunctive relief." The "normal rule" is that "partial, rather than facial, invalidation is the required course." *Id*. at 968 (quoting *Brockett v. Spokane Arcades, Inc.*, 472 U.S. 491, 504 (1985)). "So long as [the reviewing court is] faithful to legislative intent," the

---

[5] It is likewise clear from the record that most judicial bypass petitions are filed in the first trimester of a minor's pregnancy and that fetal anomalies are usually not discoverable or diagnosed until the second trimester.

court "can issue a declaratory judgment and an injunction prohibiting the statute's unconstitutional application." *Id*. at 969.

Whether a portion of a state's statute is severable is determined by the law of that state. *See Voinovich*, 130 F.3d at 202. In Ohio, "statutory provisions are presumptively severable." *Id.* Ohio law provides that:

> If any provisions of a section of the Revised Code or the application thereof to any person or circumstance is held invalid, the invalidity does not affect other provisions or applications of the section or related sections which can be given effect without the invalid provision or application, and to this end the provisions are severable.

Ohio Rev. Code § 1.50 (2006). A provision may be severed only if "severance will not fundamentally disrupt the statutory scheme of which the unconstitutional provision is a part." *Voinovich*, 130 F.3d at 202 (citing *State ex rel. Maurer v. Sheward*, 644 N.E.2d 369, 377 (Ohio 1994)).

Ohio has devised a three-factor test that determines whether severance will cause such a disruption:

> (1) Are the constitutional and the unconstitutional parts capable of separation so that each may be read and may stand by itself? (2) Is the unconstitutional part so connected with the general scope of the whole as to make it impossible to give effect to the apparent intention of the Legislature if the clause or part is stricken out? (3) Is the insertion of words or terms necessary in order to separate the constitutional part from the unconstitutional part, and to give effect to the former only?

*Id*. (quoting *Geiger v. Geiger*, 160 N.E. 28, 33 (1927)).

Applying this test, we find that the Single-Petition Rule may be severed. As to the first part of the test, the Single-Petition Rule can be read independently. Nothing in the remainder of the bypass scheme inherently requires a limit on the number of petitions. The Single-Petition Rule is therefore "capable of separation." As to the second part of the test, excising the Single-Petition Rule is not so connected to the general scope of the bypass scheme that other provisions would not have their intended effect if the court removed it. Under the final part of the test, we need only eliminate, not add, words to strike down the Single-Petition Rule. The Single-Petition Rule can simply be deleted. The invalidity of the Single-Petition Rule does not affect the remainder of Ohio's parental consent law and, therefore, is severable.

### IV.  The In-Person Rule

We now turn to the In-Person Rule. Although *Casey* upheld both an in-person informed-consent requirement and a twenty-four-hour notification requirement, the record in *Casey* as to these two issues was sparse. In the *Casey* Court's words, "there is no evidence on this record that requiring a doctor to give the information as provided by the statute would amount in practical terms to a substantial obstacle to a woman seeking an abortion." *Casey*, 505 U.S. at 884. Therefore, the Court concluded that the in-person informed-consent requirement did not constitute an undue burden. *Id.* at 885; *see also id.* at 887 ("Hence, on the record before us, and in the context of this facial challenge, we are not convinced that the 24-hour waiting period constitutes an undue burden.").

The sum of the evidence before the *Casey* Court concerning the twenty-four-hour notification requirement was as follows:

> The findings of fact . . . indicate that because of the distances many women must travel to reach an abortion provider, the practical effect will often be a delay of much more than a day because the waiting period requires that a woman seeking an abortion make at least two visits to the doctor. [I]n many instances this will increase the exposure of women seeking abortions to "the harassment and hostility of anti-abortion protestors demonstrating outside a clinic." As a result, . . . for those women who have the fewest financial resources, those who must travel long distances, and those who have difficulty explaining their whereabouts to husbands, employers, or others, the 24-hour waiting period will be "particularly burdensome."

*Id.* at 885-86. On the basis of these facts, and without reference to abused women, the Supreme Court declined to find an undue burden. The record evidence concerning abused women available to the *Casey* Court centered entirely on the impact on such women of the *spousal-notification requirement. See Casey*, 505 U.S. at 888–94. These admittedly extensive facts did not discuss the impact on abused women of the in-person informed-consent requirement. *Id.*

The Appellants in the case at bar were obviously aware of the *Casey* Court's reliance on the paucity of the record concerning how the in-person informed-consent requirement affected abused women in declining to find an undue burden. In an attempt to establish that there are abused women who effectively cannot obtain in-person informed consent with a physician at least twenty-four hours prior to receiving an abortion, the Appellants amassed an impressive amount of data, akin to the data available in *Casey* on the issue of spousal notification.

The record shows that three Ohio abortion providers, by their own policies, currently require women to come in for an in-person informed-consent meeting prior to obtaining an abortion. This meeting does not have to be with a physician. Some abortion-seeking women request to be excused from the in-person meeting. Some of these requests are denied by the clinics. Attendance is excused for women who "simply live too far away" or have "income or [other] hardship" reasons. Women excused from the in-person informed-consent meeting constitute 5 to 10 percent of abortion-seeking women. According to Appellants, the in-person meeting is all but impossible for women "in abusive situations," who constitute approximately 25 percent of the women excused by the clinics' in-person requirement. Of this 25 percent, 12.5 percent would be precluded altogether from obtaining an abortion as a result of the In-Person Rule. For abused women, appearing in person twice is difficult and, in some cases, life-threatening. Any woman who is excused from the in-person informed-consent meeting receives videos and literature through the mail sent to her or another address of her choice. All other women are required to come in for an in-person meeting prior to obtaining an abortion.

Therefore, of every 1000 women who seek an abortion, 50 to 100 are excused by the clinic from an in-person informed-consent meeting. According to the facts provided by the clinics, 6 to 12.5 of those 50 to 100 excused women will face a substantial obstacle in obtaining an abortion if forced to comply with the In-Person Rule. Therefore, for approximately 6 to 12.5 women out of every 1000 women seeking an abortion, the state's In-Person Rule would likely deter them "from procuring an abortion as surely as if [Ohio] has outlawed abortion in all cases." *Casey*, 505 U.S. at 894.

Thus, Appellants have improved on the *Casey* record, at least with respect to the issue of informed consent. Nevertheless, we find that the restriction survives constitutional scrutiny. The parties agree that the group of women who will be deterred from obtaining an abortion because of the restriction are the 12.5 women who, due to domestic abuse, cannot meet the in-person informed-consent requirement without grave risk of retaliation. The parties disagree, however, over the definition of the group for whom the law is a restriction. Appellants argue that the 12.5 women who will not obtain an abortion as a result of the restriction should be compared against all women

actually affected by the in-person requirement, defined as all women who are presently excused by the clinic from the clinic's own in-person informed-consent requirement. Ohio argues, on the other hand, that the group for whom the law is actually relevant is all women seeking an abortion.

Unlike the parties, we find that the group for whom the law is a restriction for purposes of applying *Casey's* large fraction test is "all women who seek an exception to the clinic's in-person informed-consent requirement." The record does not reflect this number.

Yet, even accepting the definition urged by Appellants, we do not find a substantial burden under *Casey*. This Court has previously found that a large fraction exists when a statute renders it nearly impossible for the women actually affected by an abortion restriction to obtain an abortion. *Voinovich*, 130 F.3d at 201. Importantly, in *Voinovich*, a large fraction was found because all women upon whom the restriction actually operated — i.e., women seeking second-trimester pre-viability abortions — would effectively be barred from exercising their constitutional right to obtain an abortion. *Id.* Other circuits that have applied the large fraction test to facial challenges to abortion regulations have, likewise, only found a large fraction when practically all of the affected women would face a substantial obstacle in obtaining an abortion. *See*, *e.g.*, *Heed*, 390 F.3d at 64; *Farmer*, 220 F.3d at 145; *Miller*, 63 F.3d at 1463; *see also Newman*, 305 F.3d at 699 (Coffey, J. concurring) (in applying the large-fraction test "it is clear [from *Casey*] that a law which incidentally prevents 'some' [of the] women [for whom the abortion restriction will actually be a burden] from obtaining abortions passes constitutional muster"). The *Casey* Court itself was not persuaded to invalidate Pennsylvania's parental-consent requirement by record evidence showing that the requirement would altogether prevent some women from obtaining an abortion. *Casey*, 505 U.S. at 899; *see also Planned Parenthood v. Casey*, 744 F. Supp. 1323, 1356-57 (E.D. Pa. 1990) (finding that in "some" of the forty-six percent of cases where a minor can neither obtain parental consent nor obtain a judicial bypass, the law "may act in such a way as to deprive [the minor] of her right to have an abortion").

To date, no circuit has found an abortion restriction to be unconstitutional under *Casey*'s large-fraction test simply because some small percentage of the women actually affected by the restriction were unable to obtain an abortion. Although a challenged restriction need not operate as a *de facto* ban for all or even most of the women actually affected, the term "large fraction," which, in a way, is more conceptual than mathematical, envisions something more than the 12 out of 100 women identified here.

### V. Conclusion

For the foregoing reasons, the judgment of the district court upholding the Single-Petition Rule is **REVERSED**, the judgment upholding the In-Person Rule is **AFFIRMED**, and the case is **REMANDED** for further proceedings consistent with this opinion.

---

**CONCURRENCE**

---

ROGERS, Circuit Judge, concurring.  I concur in Parts I, III-B, and IV of the majority opinion, and entirely in the result.  I write separately concerning the single petition rule because, as a categorical limitation on whether an abortion is permitted at all, the rule defies application of the "large fraction" test.  The Supreme Court has used the "large fraction" test instead to examine state regulation of how an abortion is to be performed or of what information should be given a woman who is legally allowed to get an abortion.  It is not necessary in this case to apply the test to the single petition rule, however, because Supreme Court holdings regarding judicial bypass procedures directly compel invalidation of that rule.

Requiring a minor to get parental consent for an abortion, without the possibility of an administrative or judicial bypass procedure that meets defined standards, unduly burdens the minor's right to an abortion.  This is the holding of *Bellotti v. Baird*, 443 U.S. 622, 647-51 (1979) (plurality opinion) ("*Bellotti II*"), reaffirmed by the Supreme Court in many subsequent cases.  *See, e.g., Lambert v. Wicklund*, 520 U.S. 292, 295 (1997) (per curiam); *Planned Parenthood v. Casey*, 505 U.S. 833, 895 (1992); *Ohio v. Akron Ctr. for Reproductive Health*, 497 U.S. 502, 510-13 (1990).  To survive constitutional challenge, a law requiring parental consent for a minor's abortion must contain a procedure that (1) allows the minor to bypass the consent requirement if she establishes that she is mature enough and well enough informed to make the abortion decision independently, (2) allows the minor to bypass the consent requirement if she establishes that the abortion would be in her best interests, (3) ensures the minor's anonymity, and (4) provides for expeditious bypass procedures.  *See Lambert*, 520 U.S. at 295.

The Supreme Court in *Bellotti II* stated that a minor possesses an absolute right to a proceeding where she may establish her entitlement to a bypass:

> A pregnant minor *is entitled in such a proceeding to show* either: (1) that she is mature enough and well enough informed to make her abortion decision, in consultation with her physician, independently of her parents' wishes; or (2) that even if she is not able to make this decision independently, the desired abortion would be in her best interests.

*Bellotti II*, 443 U.S. at 643-44 (emphasis added).  The *Bellotti II* Court explained that every minor must have the opportunity to establish that she should not have to seek parental consent based on her current level of maturity or her current best interests:

> We conclude, therefore, that under state regulation such as that undertaken by Massachusetts, every minor must have the opportunity—if she so desires—to go directly to a court without first consulting or notifying her parents.  If she satisfies the court that she is mature and well enough informed to make intelligently the abortion decision on her own, the court must authorize her to act without parental consultation or consent.  If she fails to satisfy the court that she is competent to make this decision independently, she must be permitted to show that an abortion nevertheless would be in her best interests.  If the court is persuaded that it is, the court must authorize the abortion.  If, however, the court is not persuaded by the minor that she is mature or that the abortion would be in her best interests, it may decline to sanction the operation.

*Id.* at 647-48.

Under a fair reading of *Bellotti II*, a minor's right not to seek parental consent depends on the current level of her maturity or interest in abortion. *See id.* at 647-51. *Bellotti II* also provides that this right must be protected by judicial proceedings. *See id.* But if the right is to be adequately protected, such proceedings must account for material changes in the petitioner's state after a first, unsuccessful bypass proceeding. Accordingly, under *Bellotti II*, the single petition rule is facially invalid because, after a failed first petition, the rule does not permit a judge to evaluate the petitioner's current maturity or interest in abortion in light of new developments. When a minor alleges that her current state has materially changed, an older and potentially incorrect determination will in identifiable cases nullify *Bellotti II*'s command that a minor's current state be determinative of her request for a bypass. Ohio must in some manner stand ready to evaluate minors' claims of appropriate changed circumstances. Such minors cannot constitutionally be cut off from all recourse in the manner accomplished by the single petition rule. Therefore, the single petition rule violates the right of second petitioners to *some* judicial or administrative process that evaluates their claims of changed circumstances.

While the question of successive bypass petitions was not before the *Bellotti II* Court, the Court's rationale directly compels the result in this case. The *Bellotti II* Court founded its determination of the law concerning parental consent and judicial bypass upon a careful and nuanced balancing of constitutional interests. On the one hand were the need to preserve the constitutional right to an abortion and the unique nature of the abortion decision. *See id.* at 639-44. On the other hand were "the particular vulnerability of children; their inability to make critical decisions in an informed, mature manner; and the importance of the parental role in child rearing." *Id.* at 634. These considerations preclude the single petition rule just as they led to a judicial bypass requirement in the first place in *Bellotti II*. Indeed, the *Bellotti II* Court expressly contemplated that a judicial bypass procedure would be available in later stages of pregnancy. *See id.* at 651 n.31. The state has not distinguished *Bellotti II* by identifying any way in which the single petition rule furthers the interests of protecting vulnerable minors, making up for their inability to make mature decisions, or furthering the parental role, other than simply by curtailing the availability of judicial bypass for minors with late-arising bases for a judicial bypass.

Instead, the single petition rule is said to avoid the possibility of a minor's "re-filing throughout her pregnancy until she finds a judge who will grant her petition." Appellees' Br. at 47.[1] This court does not need to decide whether a state may require minors to direct their second or successive bypass petitions to the same judge to avoid judge shopping, or require a higher burden of proof for successive petitions to limit refiling. These issues are not before us because the single petition rule does much more than limit judge shopping and unlimited refiling. Instead, it forbids a judicial bypass where one has been sought unsuccessfully before in the same pregnancy, regardless of a change in circumstances. Such a prohibition is inconsistent with the holding and reasoning of *Bellotti II*, and thus constitutes an undue burden on a minor's right to an abortion. *Casey*, which sets the standard that we are bound to apply in abortion cases, explicitly reaffirmed the *Bellotti II* holding. *See* 505 U.S. at 895, 899. Under *Bellotti II* a minor is entitled to seek a judicial bypass in the later stages of pregnancy, and none of the constitutional foundations for this decision warrants an exception so distantly related to the constitutional policies furthered by that decision. The conclusion is inescapable that the single petition rule runs afoul of *Bellotti II*, which continues to bind us.

The rationale of *Bellotti II* is of sufficiently direct applicability to the single petition rule at issue in this case that it is not necessary for us to become entangled in the meta-mathematical niceties of whether a "large fraction" of a relevant group is denied the right to an abortion. Indeed,

---

[1] The state's brief however concedes that "[t]he evidence established that second bypass petitions under the prior law were extremely rare." Appellees' Br. at 18.

the "large fraction" analysis contested by the parties is of questionable assistance in resolving the issue presented in this case. The question in this case is not the constitutionality of some procedural hurdle imposed as part of the bypass procedure, but rather the constitutionality of a categorical limit on the availability of the bypass procedure to certain minors. No matter what the circumstances, a minor who has previously been denied a judicial bypass may not obtain such a bypass during the remainder of the same pregnancy.

In evaluating the constitutionality of such a provision, the inquiry cannot be simply restated as whether "in a large fraction of the cases in which [the law] is relevant, it will operate as a substantial obstacle to a woman's choice to undergo an abortion." Such a standard may provide analytic clarity when the challenge is to a type of abortion procedure, where the question is whether the right to an abortion is sufficiently preserved by the availability of other methods. *See, e.g., Stenberg v. Carhart*, 530 U.S. 914 (2000). The "large fraction" analysis may also make sense where the question is whether the requirements of the judicial bypass procedure are so onerous as to defeat its purposes and thereby unduly burden the minor's right to an abortion. *See, e.g., Memphis Planned Parenthood, Inc. v. Sundquist*, 175 F.3d 456 (6th Cir. 1999). But where the issue is a categorical exception to the availability of a bypass procedure, the "large fraction" analysis becomes so manipulable as to lose its logical usefulness. Too much depends on the arbitrary determination of what the denominator is.

Opponents of the categorical exception will simply argue that the denominator is the persons precluded by the exception, leading to a large fraction of one. Thus plaintiffs in this case argue that the denominator consists of "all women who are denied a bypass and who later discover medical and other information causing them to renew their pursuit of an abortion." Appellants' Reply Br. at 2. As the district court noted in its order denying CWS's motion for a stay pending appeal, "[i]mplicit in Plaintiffs' argument is a contention . . . that the only relevant group in considering whether a regulation creates an undue burden is those women who are actually foreclosed from obtaining an abortion." Any plaintiff so defining the denominator could automatically show a fraction of one (i.e., one-hundred percent), and thereby invalidate any categorical exception to the availability of a bypass procedure.

Defenders of the exception, on the other hand, must argue a larger denominator, some class of abortion-seeking women that also includes persons not precluded. Thus defendants in this case argue that the denominator should include all women who are initially denied bypasses, regardless of circumstances that might obviate the need for a later bypass. In the absence of evidence that a large portion of minors initially denied a bypass will need one later, defendants argue that the relevant fraction is small. In contrast, but to a similar result, the district court at one point considered the denominator to be minors whose need for a judicial bypass arises at a later point during pregnancy, regardless of whether a bypass has been sought previously. *Cincinnati Women's Servs., Inc. v. Taft*, 2005 U.S. Dist. LEXIS 23015, at *49. The district court reasoned that "it is only speculation that a large fraction of minors who develop fetal anomalies in the second trimester will have already filed a petition for a bypass of parental consent." *Id.* at *48. The difficulty with these broader-denominator analyses is that they are in some tension with the idea that "[t]he proper focus of constitutional inquiry is the group for whom the law is a restriction, not the group for whom the law is irrelevant." *Casey*, 505 U.S. at 894; *Women's Med. Prof'l Corp. v. Voinovich*, 130 F.3d 187, 194-97 (6th Cir. 1997). Where there is a categorical exception to the availability of a judicial bypass, it is arguably somewhat artificial to say that those outside the category are within the group for whom the law is a restriction.

Thus, outside the context of an abortion law that limits the types of abortions, or imposes procedural hurdles to a judicial bypass, a total preclusion for a defined category of cases defies "large fraction" analysis. In this context the district court's observations about the indeterminacy of the large fraction test are particularly compelling:

The "large fraction" standard enunciated in *Casey* by nature invites the courts and the parties to engage in a number-crunching exercise to assess the impact of an abortion regulation. The parties have tried to do so here. Nevertheless, stating that a "large fraction" constitutes a substantial obstacle is not the same thing as defining a "large fraction." Because the Supreme Court instructs that the constitutional analysis should focus on only those women for whom the restriction is actually relevant, *Casey*, 112 S. Ct. at 2829, the argument devolves to which group of women is properly considered the numerator and which group of women is properly considered the denominator. Even if a court properly identifies the numerator and denominator, it still must decide whether the resulting fraction is "large." Again, the *Casey* Court provides no real guidance. This Court's research has not developed any decisions in which the courts which have successfully applied, or have even attempted to apply, the large fraction test.

*Taft*, 2005 U.S. Dist. LEXIS 23015, at *10–11 (footnote omitted).

Indeed, wooden application of a pure "large fraction" analysis would lead to the following anomaly. Suppose a state law precluded a judicial bypass for persons who had traveled to Fiji in the previous three months. The number of such persons in the state who needed a judicial bypass would be a tiny fraction of any relevant group, other than the group of persons who need a judicial bypass who have been to Fiji. Yet it is hard to imagine that the Supreme Court would uphold such a limit under a "large fraction" analysis. On the other hand, there may be categorical limitations on the availability of a judicial bypass that would *not* be an undue burden on the right to an abortion. Although *Bellotti II* was handed down more than a decade before *Casey*, Justice Powell's opinion in *Bellotti II* explicitly applied an "undue burden" test, albeit without using any "large fraction" analysis. 443 U.S. at 640, 647–48. The opinion cannot fairly be read to preclude any type of categorical limitation on the availability of a judicial bypass. Such a reading, unnecessary today, would be an overly formal and artificial application of a "large fraction" analysis that makes sense only in other contexts.